**XXL OF OHIO, INC., Plaintiffs,**

v.

**CITY OF BROADVIEW HEIGHTS, et al., Defendants/Third Party Plaintiff,**

No. 1:01CV2514.

United States District Court, N.D. Ohio, Eastern Division.

Jan. 13, 2004.

Douglas J. Maragas, Bend, OR, Paul A. Mastriacovo, Canton, OH, for Plaintiff.

Kevin P. Weiler, Sr., Weiler & Associates, Brecksville, OH, Carl E. Cormany, Mazanec, Raskin & Ryder, Solon, OH, James A. Climer, Robert F. Cathcart, IV, Mazanec, Raskin & Ryder, Cleveland, OH, for Defendants.

Kevin P. Weiler, Sr., Weiler & Associates, Brecksville, OH, Robert F. Cathcart, IV, Mazanec, Raskin & Ryder, Cleveland, OH, for Third Party Plaintiff.

Carl E. Cormany, Mazanec, Raskin & Ryder, Solon, OH, Timothy D. Johnson, Weston, Hurd, Fallon, Paisley & Howley, Cleveland, OH, for Third Party Defendant.

## MEMORANDUM OF OPINION AND ORDER

MATIA, Chief Judge.

This action is before the Court upon Magistrate Judge Patricia A. Hemann's Report and Recommendation (Doc. 85).

It is not necessary to duplicate Magistrate Judge Hemann's thorough and exhaustive review of the law here. The Court, after lengthy *de novo* consideration of the objections filed by the defendants (Doc. 87) and the plaintiff (Doc. 89), overrules said objections and approves and adopts the report and recommendation—with two exceptions.

The Court does not agree with the magistrate judge's recommendation that the defense of qualified immunity should not be available to the mayor and members of the city council of Broadview Heights. "[T]o find a clearly established constitutional right, a district court must find binding precedent by the Supreme Court, its court of appeals or itself." *Ohio Civil Serv. Employees Ass'n v. Seiter,* 858 F.2d 1171, 1177 (6th Cir.1988). "For a right to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Centanni v. Eight Unknown Officers,* 15 F.3d 587, 588 (6th Cir.) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)), *cert. denied,* 512 U.S. 1236, 114 S.Ct. 2740, 129 L.Ed.2d 860 (1994).

The Court finds that the law was not—indeed, is not—clearly established in this area. Although a prior case in this district struck down a similar ordinance, *North Olmsted Chamber of Commerce v. City of North Olmsted,* 86 F.Supp.2d 755 (N.D.Ohio 2000), there has been no decision by the Court of Appeals for the Sixth Circuit. In fact, certain aspects of the

Broadview Heights sign code were previously upheld by this Court. *Sims v. City of Broadview Heights,* No. 1:91cv1070 (N.D. Ohio filed March 11, 1993), *rev'd and remanded,* 41 F.3d 1507, 1994 WL 637806 (6th Cir. Nov.14, 1994), No. 1:91cv1070 (N.D. Ohio filed Aug. 7, 1995), *appeal dism'd per stipulation,* No. 95–3957 (6th Cir. filed June 10, 1997). Additionally, other district courts have disagreed with the *North Olmsted* analysis. *E.g., Granite State Outdoor Advertising, Inc. v. City of Clearwater, Florida,* 213 F.Supp.2d 1312, 1328 (M.D.Fla.2002), *aff'd in part, rev'd in part, and remanded,* 351 F.3d 1112 (11th Cir.2003). Thus it cannot be said that the law was clearly established when the city officials took the action that led to this complaint.

The Court also declines to overturn Chapter 1479 of the Certified Ordinances of Broadview Heights ("the sign ordinance" or "the ordinance") *en toto* or order the alteration of the ordinance. The undersigned doesn't think a judge should order a legislative body to alter an ordinance. The magistrate judge has indicated how the sign ordinance could be changed to pass constitutional muster,[1] but the decision whether to do so is properly left to the council.

Moreover, this Court wishes to make it perfectly clear that it does not agree with the current state of the law with respect to First Amendment protection for commercial speech. However, the Court is bound to follow Supreme Court interpretations, no matter how mistaken they may be. Accordingly,

1. Plaintiff's motion for summary judgment (Doc. 57) is GRANTED and defendants' motion for summary judgment (Doc. 67) is DENIED as to the following claims:

 a. the ordinance unconstitutionally restricts non-commercial speech and impermissibly discriminates as to non-commercial speech according to its content;

 b. the ordinance impermissibly discriminates as to commercial speech according to content;

 c. the ordinance is an impermissible prior restraint of speech;

 d. the selective prohibition on pole signs in the sign ordinance makes impermissible content-based distinctions; and

 e. The City of Broadview Heights violated the plaintiff's right to procedural due process in removing the pole sign.

2. Defendants' motion for summary judgment (Doc. 67) is GRANTED as to the plaintiff's claim that Broadview Heights' application of the sign ordinance violates the equal protection clause.

3. Plaintiff's motion for summary judgment (Doc. 57) is GRANTED IN PART and defendants' motion for summary judgment (Doc. 67) is GRANTED IN PART as to:

 a. the plaintiff's claim that certain terms in the ordinance are void for vagueness (as described on pp. 806–08 of the Report and Recommendation); and

 b. the plaintiff's claim that the sign ordinance facially violates the equal protection clause (as described on pp. 810–12 of the Report and Recommendation).

4. The Court declines to rule on the arguments regarding whether Broadview Heights' sign ordinance violates Ohio's ban on retroactive zoning changes because they involve issues of state law made moot by the Court's resolution of the plaintiff's federal claims.

5. The named individual defendants are entitled to qualified immunity.

---

**1.** *See, e.g.,* pp. 64–66 and 71–72 of the Report and Recommendation.

6. Plaintiff's motion for summary judgment (Doc. 57) and defendants' motion for summary judgment (Doc. 67) are DENIED as to all other claims.

IT IS SO ORDERED.

## REPORT AND RECOMMENDATION

Docket ## 57, 67

HEMANN, United States Magistrate Judge.

## I. Outline

Magistrate judge jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .774
Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .774
General questions of law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .777
First Amendment claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .777
 Standing and overbreadth . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .778
 Standards of review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .780
 Non-commercial speech . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .780
 Content-based restrictions on non-commercial speech . . . . . . . . . . . . . . . . . . .780
 Content-neutral restrictions on non-commercial speech . . . . . . . . . . . . . . . . .782
 Commercial speech . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .783
 The ordinance and content discrimination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .784
 Content discrimination in the ordinance and non-commercial speech . . . . . . . . . .784
 Content-based restrictions on speech in the ordinance . . . . . . . . . . . . . . . . . . .784
 The extent of content-based restrictions on non-commercial speech . . . . .785
 Content-based restrictions on non-commercial speech and strict
 review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .789
 Content discrimination in the ordinance and commercial speech . . . . . . . . . . . . . .792
 Standard of review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .792
 Restrictions on commercial speech and the time, place, and manner
 test . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .792
 Content-based restrictions on commercial speech . . . . . . . . . . . . . . . . .792
 Content-based restrictions on commercial speech not narrowly
 tailored . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .794
 The ban on pole signs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .795
 The ordinance and prior restraint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .797
 Permits and prior restraint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .797
 The permit scheme in Broadview Heights' sign ordinance . . . . . . . . . . . . . . . . . . .798
 Broadview Heights' sign ordinance as a system of prior restraint . . . . . . . . . . . . .801
 Severability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .803
 The standard for severability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .803
 Severability and violations of the First Amendment in the ordinance . . . . . . . . . .804
 Conclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .804
Vagueness claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .805
 The standard for determining impermissible vagueness . . . . . . . . . . . . . . . . . . . . . . .805
 Vagueness in the sign ordinance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .806
 Severability of impermissibly vague terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .808
 Conclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .810
Equal protection claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .810
 Alleged facial violation of the equal protection clause . . . . . . . . . . . . . . . . . . . . . . . . .810
 Alleged violation of the equal protection clause as applied . . . . . . . . . . . . . . . . . . . .812
 Severance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .812
 Conclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .813
Due process claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .813
 Standing and ripeness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .813
 Process in the sign ordinance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .814
 Removal of XXL's pole sign and procedural due process . . . . . . . . . . . . . . . . . . . . . . .815
Retroactive zoning . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .816
Individual liability for city officials . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .816
 Pleading individual liability for municipal officials . . . . . . . . . . . . . . . . . . . . . . . . . . .816
 Whether XXL has sufficiently pleaded individual responsibility . . . . . . . . . . . . . . . . .818

Liability for individual defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 818
 The standard for qualified immunity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 819
 Qualified immunity and the individual defendants . . . . . . . . . . . . . . . . . . . . . . . . 820
Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 824

## II. Magistrate judge jurisdiction

This case is before the magistrate judge on referral. Pending is the motion of plaintiff, XXL of Ohio, Inc. ("XXL"), for summary judgment ("Pl. mot."; Docket # 57). Defendants, the City of Broadview Heights ("Broadview Heights" or "the city") and past and present city officials, oppose this motion. Also pending before the court is the motion of defendants for summary judgment ("Def. mot."; Docket # 67). For the reasons given below the magistrate judge recommends that the court grant plaintiff's motion in part and overrule it in part and grant defendants' motion in part and overrule it in part.

## III. Background

Plaintiff, XXL, is an Ohio corporation which owns and operates a Tallyho Motel ("the motel") in Broadview Heights. The motel is located on State Route 82 and is about a tenth of a mile from Interstate 77 ("1–77"). This case is before the court because, pursuant to the city's sign ordinance, Broadview Heights has refused to allow XXL to retain its current signage. Defendants are Broadview Heights, the mayor of Broadview Heights, and all members of the city's council at the time the city refused to allow XXL to retain its signage.

Broadview Heights adopted a comprehensive sign ordinance ("the sign ordinance" or "the ordinance") on November 5, 1990. Certified Ordinances of Broadview Heights ("C.O.B.H.") Ch. 1479. The sign ordinance expresses certain objectives to be achieved by the ordinance as enacted:

> This chapter is established to control the type, design, size, location and maintenance of signs in order to achieve the following objectives:

(1) To promote and maintain high quality residential districts and attractive public facilities;

(2) To provide for appropriate signs for identifying business by relating the size, type and design of signs to the type, size and nature of the establishment;

(3) To control the design and size of all signs so that they will be harmonious with their surrounding areas;

(4) To provide a safe environment by eliminating any conflict between advertising or identification signs and traffic control signs which would be hazardous to the safety of the public;

(5) To control temporary signs and prohibit undesirable impacts on property values and neighborhood character; and

(6) In business districts, to provide for appropriate signs for advertising goods or services rendered in keeping with the type of establishment involved.

C.O.B.H. § 1479.01(a). The sign ordinance also incorporates certain conclusions as justification for the ordinance:

> [T]he City has determined that, without adequate regulation and design standards, signs are a nuisance. The number of signs in Broadview Heights is excessive and is unduly distracting to motorists and pedestrians, creates a traffic hazard, and in some places reduces the effectiveness of signs needed to direct the public. As the appearance of the City is marred by the excessive number, oversized and poorly designed signs, both residential and business property values are adversely affected. Therefore, the number of such distract-

ing signs ought to be reduced and signs permitted should comply with the standards of this chapter in order to reduce the aforementioned effects.

(1) The signs of least value to the people of Broadview Heights are those which carry commercial messages other than the advertisement of any product, service, event, person, institution or business located on the premises where the sign is located.

(2) In view of the foregoing, all signs not conforming with the provisions of this chapter are hereby declared a nuisance. It is further declared that the regulations contained in this chapter are the minimum regulation necessary to abate the nuisance and to achieve the purposes of this chapter.

C.O.B.H. § 1479.01(b).

The sign ordinance governs commercial and non-commercial signs. It classifies signs by use type and structural type, and the classification "use type" is further divided into permanent and temporary signs:

(1) *Permanent signs.*

A. Billboard. One which directs attention to a specific business, product, service, entertainment or other activity sold, offered or conducted elsewhere than upon the same lot on which the sign is located.

B. Bulletin board. An announcement sign which directs attention to and is located on the lot which is the subject of said sign.

C. Directional sign. One indicating the direction pedestrian or vehicular traffic is requested to move on that location.

D. Identification sign. One indicating the name and address of a building, development, public or semipublic facility, business, office or industrial establishment. Such signs may also include the names of tenants, general type of goods sold, or services rendered; however, the listing of specific goods or services, brand names, prices, "sale" or telephone numbers shall not be permitted.

E. Information signs. One which presents miscellaneous information intended to serve the public. Typical signs present travel information, vehicle service, weather, time, historic and scenic sites, recreation facilities, etc. An informational sign may be permitted in any district upon approval of the Planning Commission.

F. Nameplate. One which indicates the name, address or profession of a person or persons occupying a building or unit of a building.

G. Handicapped parking. A sign indicating a parking area reserved for a vehicle exhibiting a State issued disabled persons parking permit or license plate. The sign shall be at eye level, blue with the standard white profile of a wheelchair and occupant in the center. The sign may also include the warning statement "Unauthorized vehicles will be towed away at the owners [sic] expense."

(2) *Temporary signs.*

A. Project sign. One indicating the promotion, development and construction on the property on which it is located, and which sign may include the owner, architects, engineers, contractors and other individuals or firms involved with the construction.

B. Real estate sign. A ground sign calling attention to rental, sale or lease of property where it is posted.

C. Sale sign. A window sign, such as "sale," "special," "clearance,"

symbolic or graphic signs, such as a red heart for Valentine's Day, or identifying prices and/or items for sale.

D. Special event sign. One which may be in the street right of way announcing a public function.

E. Specific product sign. One which only indicates a specific class of products or product from a company.

F. Temporary directional sign. A ground sign directing vehicular or pedestrian traffic to a temporary activity taking place at another, but nearby, location, such as an open house sign for the sale of real estate.

G. Political sign. A sign referring to a political contest, involving candidates and/or issues.

H. Temporary identification sign. A sign indicating the name and address of a building, development, public or semipublic facility, business, office or industrial establishment.

C.O.B.H. § 1479.03(a).

The sign ordinance sets forth where, when, and how signs may be erected and maintained according to use and structural type and requires a permit "to erect, place, paint, relocate or alter" any permanent or temporary sign except certain temporary signs. C.O.B.H. § 1479.13. One provision of the sign ordinance bans pole signs. C.O.B.H. § 1479.07(e).

The sign ordinance as originally enacted required the removal of all nonconforming signs by November 5, 1995. This deadline was later extended to November 5, 1996. The current version of the ordinance requires the removal of nonconforming signs, including those signs which existed and were permitted prior to passage of the sign ordinance, "at any time that the own-ership of the underlying business or activity to which the sign refers is changed and/or at such time that a change of fascia of the sign is requested." C.O.B.H. § 1479.15(c). The city may remove a nonconforming sign as a nuisance if the sign's owner fails to remove the sign when ordered to do so by the Building Commissioner. C.O.B.H. §§ 1479.14 & 1479.19.

Plaintiff's signage included a pole sign visible from I–77 and a second pole sign not visible from the highway. The second pole sign was shared with a restaurant owned by Arnold Davis ("Davis") and located in front of the motel. These signs predated passage of the sign ordinance and are nonconforming signs under the ordinance. Plaintiff bought the motel after passage of the sign ordinance and changed the fascia of the motel's signs to reflect the new name of the hotel.

On August 20, 2000, after the transfer of ownership of the hotel and a change of fascia of the signs at the motel, the city began issuing citations to XXL for violations of the sign ordinance and demanded that XXL remove the hotel's nonconforming signs. XXL filed the instant action challenging the sign ordinance on November 1, 2001. XXL alleges that the sign ordinance is unconstitutional under the First, Fifth, and Fourteenth Amendments and violates Ohio law. Defendants deny these allegations. XXL seeks an order permanently enjoining enforcement of the sign ordinance. XXL also seeks $2,500,000 and costs and expenses, including reasonable attorney fees, pursuant to 42 U.S.C. § 1983 (§ 1983).

On November 14, 2001 the court entered an order which, *inter alia,* prohibited XXL from erecting any new signs for the motel and requiring that defendant Broadview Heights "shall not remove or dismantle nor cause or attempt to cause the removal or dismantling of the sign(s) referred to in the Complaint due to any noncompliance

with the Codified Ordinances...." Order (Docket #19), pp. 1–2. On November 13, 2002, Davis removed the pole sign that his restaurant shared with the motel. Davis effected this removal upon order of the Broadview Heights Building Commissioner.

XXL moves for summary judgment on five grounds: (1) the ordinance impermissibly restricts speech protected by the First Amendment and the Ohio Constitution, (2) provisions in the ordinance are void for vagueness, (3) the ordinance violates the equal protection clause of the Fourteenth Amendment, (4) section 1479.14 of the ordinance violates procedural due process, and (5) the ordinance violates Ohio's protections against retroactive zoning.[1] XXL further claims that the unconstitutional provisions of the ordinance are not severable from the constitutional provisions and moves the court to overturn the entire ordinance. Defendants oppose XXL's motion and move for summary judgment on XXL's claims.

## IV. General questions of law

Summary judgment "shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party must demonstrate to the court through reference to pleadings and discovery responses the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. The nonmoving party must then show the existence of

a material fact which must be tried. *Id.* at 324, 106 S.Ct. 2548.

When evaluating a motion for summary judgment, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to ... the party opposing the motion...." *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *see also Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); *Aetna Ins. Co. v. Loveland Gas & Elec. Co.*, 12 Ohio Misc. 230, 369 F.2d 648 (6th Cir.1966). This includes taking the nonmoving party's uncontradicted allegations as true and giving the benefit of the doubt to the nonmoving party's assertions when they conflict with those of the movant. *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); *Bosely v. City of Euclid*, 496 F.2d 193, 197 (6th Cir.1974).

The court's treatment of facts and inferences in a light favorable to the nonmoving party does not relieve that party of its obligation "to go beyond the pleadings" to oppose an otherwise properly supported motion for summary judgment under Rule 56(e). *See Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. The nonmoving party must oppose a proper summary judgment motion "by any of the kinds of evidentiary material listed in Rule 56(c), except the mere pleadings themselves...." *Id.* A scintilla of evidence in favor of the nonmoving party is not sufficient. There must be enough evidence that a reasonable jury could find for the nonmoving party. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir.1989).

## V. First Amendment claims[2]

XXL alleges that Broadview Heights' sign ordinance as enacted violates the

---

1. XXL has withdrawn its claim that distinctions in the ordinance are so arbitrary and

irrational as to violate substantive due process.

2. Neither party moves for summary judgment

First Amendment in three ways: (1) in discriminating according to content; (2) in banning pole signs, and (3) in acting as a prior restraint on speech.[3] XXL claims that these violations improperly burden both commercial and non-commercial speech. Broadview Heights denies that its ordinance impermissibly discriminates according to content or acts as a prior restraint on speech and denies that its ban on all pole signs offends the First Amendment. Broadview Heights further argues that XXL lacks standing to assert alleged violations of the First Amendment with regard to non-commercial speech. XXL replies that it has standing to assert claims regarding non-commercial speech because it has posted and wishes to post in the future non-commercial messages and because it has standing by virtue of the doctrine of overbreadth. The magistrate judge will first examine the question of XXL's standing to allege First Amendment violations as regards non-commercial speech, then will examine the merits of XXL's claims, beginning with consideration of the relevant standards of review.

## A. Standing and overbreadth

In addition to XXL's claims that Broadview Heights' sign ordinance is unconstitutional as applied to XXL, XXL claims that the ordinance is facially overbroad. That is, XXL claims that on its face Broadview Heights' sign ordinance burdens speech which is constitutionally protected.

■ As a rule "a person to whom a statute may constitutionally be applied may not challenge that statute on the ground that it may conceivably be applied unconstitutionally to others in situations not before the Court." *New York v. Ferber*, 458 U.S. 747, 767, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982). An exception to this rule is a challenge to laws and regulations on the ground that they are facially overbroad under the First Amendment. Such a challenges contends that "an otherwise valid law might be applied unconstitutionally in a specific context." *Amelkin v. McClure*, 205 F.3d 293, 296 (6th Cir.2000). "Where an overbreadth attack is successful, the statute is obviously invalid in all of its applications, since every person to whom it is applied can defend on the basis of the same overbreadth." *Board of Trustees of the State Univ. of New York v. Fox*, 492 U.S. 469, 483, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989).

The overbreadth exception to the general rule that a litigant may not defend the rights of other parties is warranted because "the transcendent value to all society of constitutionally protected expression is deemed to justify allowing 'attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity.'" *Gooding v. Wilson*, 405 U.S. 518, 520–521, 92 S.Ct.

---

as to free speech rights protected by the Ohio Constitution. The Ohio Supreme Court has found, however, that because "[u]nder the Ohio Constitution, free speech guarantees are no broader than those guaranteed by the First Amendment to the United States Constitution ... [t]he First Amendment is the proper basis for interpretation of Section 11, Article I, Ohio Constitution, the provision that establishes those free speech guarantees in Ohio." *City of Cleveland v. Trzebuckowski*, 85 Ohio St.3d 524, 528, 709 N.E.2d 1148, 1152 (1999) (citations omitted); *see also State ex rel. Bea-*

con *Journal Publ'g Co. v. Bond*, 98 Ohio St.3d 146, 150, 781 N.E.2d 180, 187 (2002).

**3.** XXL also alleges that the City violates the First Amendment because it discriminates in its enforcement of the sign ordinance. XXL's arguments concerning this allegation, however, are advanced in that portion of plaintiff's brief devoted to alleged violations of equal protection. The magistrate judge will consider this allegation, therefore, in that portion of this Report and Recommendation.

1103, 31 L.Ed.2d 408 (1972) (quoting *Dombrowski v. Pfister*, 380 U.S. 479, 486, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965)). The exception ensures that persons who decline to engage in constitutionally-protected speech for fear of punishment may nonetheless have their First Amendment rights vindicated. *Gooding*, 405 U.S. at 520–521, 92 S.Ct. 1103; *see also Los Angeles Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 39, 120 S.Ct. 483, 145 L.Ed.2d 451 (1999).

Courts use the overbreadth doctrine reluctantly. "Because of the wide-reaching effects of striking down a statute on its face at the request of one whose own conduct may be punished despite the First Amendment, we have recognized that the overbreadth doctrine is 'strong medicine' and have employed it with hesitation, and then 'only as a last resort.'" *Ferber*, 458 U.S. at 769, 102 S.Ct. 3348 (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 613, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)). A statute should be construed to avoid constitutional problems if the statute is subject to such a limiting construction. If the statute is not subject to a narrowing construction, only the unconstitutional portion of the statute should be invalidated if it is severable from the rest of the statute. *Ferber*, 458 U.S. at 769 n. 24, 102 S.Ct. 3348. If the statute cannot be construed to avoid constitutional problems and if the impermissible portion of the statute is not severable, then the overbreadth must be substantial before a statute will be invalidated on its face. *Id.* at 770–73, 102 S.Ct. 3348.

A statute which affects both speech and conduct will be invalidated under this doctrine only if the statute's overbreadth is real and substantial in relation to its "plainly legitimate sweep." *Id.*, 458 U.S. at 769–70, 102 S.Ct. 3348. Overbreadth is real and substantial when there is "a realistic danger that the ordinance itself will significantly compromise recognized First Amendment protections of parties not before the Court." *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 801, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984).

■ The overbreadth doctrine is inapplicable when the entire scope of an ordinance restricts only commercial speech. *Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 496–97, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). When an ordinance restricts both commercial and non-commercial speech, however, a party whose purely commercial speech has been sanctioned may assert the non-commercial speech rights of others by using the overbreadth doctrine. *Fox*, 492 U.S. at 481–82, 109 S.Ct. 3028; *Metromedia, Inc. v. City of San Diego*, 453 U.S. at 504 n. 11, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981).

■ Broadview Heights' sign ordinance affects both commercial and non-commercial speech. *See, e.g.,* C.O.B.H. § 1479.07(a) (prohibiting certain types of signs for purposes of advertising) *and* C.O.B.H. § 1479.19 (governing the removal of political signs). Thus, even though only XXL's commercial speech is at issue in the instant case, XXL may assert the non-commercial speech rights of others by using the overbreadth doctrine.

■ The ordinance affects both speech and conduct. The ordinance affects the erection of a sign as well as the display of a flag, acts which are intended to communicate. *See United States v. Grace*, 778 F.2d 818, 821 (D.C.Cir.1985); *Wooley v. Maynard*, 430 U.S. 705, 713 n. 10, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977); *see also American Legion Post 7 v. City of Durham*, 239 F.3d 601 (4th Cir.2001) (finding the flying of the flag to be expressive conduct); *Dimmitt v. City of Clearwater*, 985 F.2d 1565, 1569 (11th Cir.1993) (find-

ing a sign ordinance which "applies to virtually any form of graphic communication that is publicly displayed" to reach expressive conduct). The ordinance affects both purely expressive aspects of signs [4] and the purely physical aspects of signs.[5] Because the ordinance affects both speech and conduct, the court may invalidate the ordinance on its face only if the ordinance's overbreadth, if any, is real and substantial.

Finally, because XXL applies the overbreadth doctrine to challenge portions of the statute not otherwise at issue in the instant case, the court must construe the ordinance so as to avoid constitutional problems, must sever any unconstitutional portion of the ordinance if severance is possible, and, if severance is not possible, may invalidate the ordinance on its face only if the overbreadth is substantial.

## B. Standards of review

The standard of review for weighing alleged violations of the First Amendment's Free Speech clause depends upon whether the restricted speech is non-commercial or commercial speech and whether the claimed unconstitutional restrictions are content-based or content-neutral.

### 1. Non-commercial speech

■ Generally, an ordinance may not impose greater restrictions on non-commercial speech than on commercial speech. *Metromedia*, 453 U.S. at 514–17, 101 S.Ct. 2882. In determining whether other restrictions on non-commercial speech are permissible, a court must consider whether the restrictions are content-based or content-neutral.

### a. Content-based restrictions on non-commercial speech

■ With few exceptions, "[r]egulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment." *Regan v. Time, Inc.*, 468 U.S. 641, 648–649, 104 S.Ct. 3262, 82 L.Ed.2d 487 (1984). The Supreme Court uses several measures to determine whether a restriction on speech is content-based or content-neutral. A law imposes content-based restrictions on speech when "the very basis for the regulation is the difference in content...." *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993); *see also United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 811, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000). A regulation is not content-neutral merely because it does not discriminate between viewpoints on a particular subject. *See Boos v. Barry*, 485 U.S. 312, 319, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988). A regulation which imposes restrictions based upon the particular viewpoint or information in the speech or imposes restrictions based upon the general subject matter of the speech imposes content-based restrictions. *See Rosenberger v. Rector & Visitors of the Univ. of Virginia*, 515 U.S. 819, 828–29, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995); *Playboy Entm't*, 529 U.S. at 811–12, 120 S.Ct. 1878; *Boos*, 485 U.S. at 318, 108 S.Ct. 1157; *Consolidated Edison Co. of New York, Inc. v. Public Serv. Comm'n*, 447 U.S. 530, 537–38, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980) ("To allow a government the choice of permissible subjects for public debate would be to allow that gov-

---

4. For example, the ordinance mandates that "[s]igns visible from the sight lines along a street shall not contain ... words such as 'stop,' 'go,' 'slow,' etc. ....." C.O.B.H. § 1479.05(f).

5. For example, the ordinance states that "[s]igns and their supporting structures shall be repaired an painted as often as necessary to prevent rusting, peeling pain and undue fading." C.O.B.H. § 1479.14.

ernment control over the search for political truth.").[6] Also, a regulation which imposes restrictions based upon the identity of the speaker imposes content-based restrictions. *Rosenberger*, 515 U.S. at 828–29, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) ("In the realm of private speech or expression, government regulation may not favor one speaker over another."). Further, an otherwise content-neutral regulation which has incidental effects which burden some or all speech must be "justified without reference to the content of the regulated speech...." *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989); *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984); *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976).[7] Otherwise, the regulation will be deemed a content-based regulation of speech. Finally, a regulation aimed at the secondary effects of sexually-explicit speech is content-neutral even if the regulation distinguishes the speech by its sexual content as long as the regulation is not justified by reference to the content of the speech. *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 290–91 (6th Cir.1998).[8]

When a regulation imposes content-based restrictions on speech, the regulation is constitutional only if it passes the test of strict scrutiny:

Under the strict-scrutiny test, respondents have the burden to prove that the [regulation] is (1) narrowly tailored, to serve (2) a compelling state interest. In order for respondents to show that the

6. Viewpoint-based restrictions have their own implications under the First Amendment. *See Taxpayers for Vincent*, 466 U.S. at 804, 104 S.Ct. 2118; *Schacht v. United States*, 398 U.S. 58, 63, 90 S.Ct. 1555, 26 L.Ed.2d 44 (1970). "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. Viewpoint discrimination is thus an egregious form of content discrimination." *Rosenberger*, 515 U.S. at 829, 115 S.Ct. 2510 (citation omitted).

7. Defendant contends that the ordinance is content-neutral because it has not been adopted due to disagreement with any message conveyed. Even if this is true, it does not preclude a finding that the ordinance is content-based:

Deciding whether a particular regulation is content based or content neutral is not always a simple task. We have said that the "principal inquiry in determining content neutrality ... is whether the government has adopted a regulation of speech because of [agreement or] disagreement with the message it conveys." The purpose, or justification, of a regulation will often be evident on its face. But while a content-based purpose may be sufficient in certain circumstances to show that a regulation is content based, it is not necessary to such a showing in all cases. Nor will the mere assertion of a content-neutral purpose be enough to save a law which, on its face, discriminates based on content.

*Turner Broad. Sys., Inc. v. Federal Communications Comm'n*, 512 U.S. 622, 642–43, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) (citations omitted). Broadview Heights' sign ordinance on its face discriminates on the basis of content. It is, therefore, a content-based regulation.

8. Defendants argue incorrectly that this standard applies to the speech at issue in the instant case. *See infra*, pp. 803–04. But a regulation aimed at sexually-explicit speech is treated differently from other speech in determining whether the regulation is content neutral. According to he Sixth Circuit:

The reason for this difference in treatment is that the Supreme Court has held that although sexually explicit expression is protected by the First Amendment, "society's interest in protecting this type of expression is of a wholly different, and lesser, magnitude" than the societal interest in other forms of expression, such as political debate.

*Connection Distrib.*, 154 F.3d at 291 (quoting *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 70, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976)).

[regulation] is narrowly tailored, they must demonstrate that it does not "unnecessarily circumscrib[e] protected expression."

*Republican Party of Minnesota*, 536 U.S. 765, 773–77, 122 S.Ct. 2528, 2534–35, 153 L.Ed.2d 694 (2002) (citations omitted) (quoting *Brown v. Hartlage*, 456 U.S. 45, 54, 102 S.Ct. 1523, 71 L.Ed.2d 732 (1982)). Narrow tailoring of remedies requires that "[i]f a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative. To do otherwise would be to restrict speech without an adequate justification, a course the First Amendment does not permit." *Playboy Entm't*, 529 U.S. at 813, 120 S.Ct. 1878 (citations omitted).

### b. *Content-neutral restrictions on non-commercial speech*

When a regulation imposes content-neutral restrictions on speech, courts evaluate the constitutionality of the regulation using an intermediate level of scrutiny, rather than the strict level of scrutiny appropriate to content-based restrictions. Two tests are generally used to enact intermediate scrutiny: a time, place, and manner test and the four-part test first described in *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).[9]

▮ Under a time, place or manner test, the restrictions "must not be based on the content of the message, must be narrowly tailored to serve a significant governmental interest, and must leave open ample alternatives for communication." *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 323 n. 3, 122 S.Ct. 775, 151 L.Ed.2d 783 (2002) (quoting *Forsyth County, Georgia v. Nationalist Movement*, 505 U.S. 123, 130, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992)); *see also Ward*, 491 U.S. at 790,

109 S.Ct. 2746 (quoting *Community for Creative Non–Violence*, 468 U.S. at 293, 104 S.Ct. 3065, for the alternative test that time, place, and manner restrictions in a public forum must be *"justified* without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information" (emphasis added)). "[T]he essence of time, place, or manner regulation lies in the recognition that various methods of speech, regardless of their content, may frustrate legitimate governmental goals. No matter what its message, a roving sound truck that blares at 2 a.m. disturbs neighborhood tranquility." *Consolidated Edison Co. of New York*, 447 U.S. at 536, 100 S.Ct. 2326. The Supreme Court has emphasized that regulations which impose restrictions on speech based upon the subject matter of the speech fail the time, place, and manner test:

> time, place, and manner regulations must be "applicable to all speech irrespective of content." Governmental action that regulates speech on the basis of its subject matter " 'slip[s] from the neutrality of time, place, and circumstance into a concern about content.' " Therefore, a constitutionally permissible time, place, or manner restriction may not be based upon either the content or subject matter of speech.

*Consolidated Edison Co. of New York*, 447 U.S. at 537, 100 S.Ct. 2326 (citations and footnote omitted); *see also Discovery Network*, 507 U.S. at 428–30, 113 S.Ct. 1505 (noting that where the difference in content is the basis for the regulation, the regulation is content-based regardless of

---

**9.** These tests are substantially the same. "The *O'Brien* test" in the last analysis is little, if any, different from the standard applied to

time, place, or manner restrictions." *Ward*, 491 U.S. at 798, 109 S.Ct. 2746.

whether the justification for the regulation is the difference in content).

 Under the *O'Brien* test, a regulation will be sustained if it is content-neutral and if "it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *O'Brien*, 391 U.S. at 377, 88 S.Ct. 1673; *see also Turner Broad.*, 512 U.S. at 662, 114 S.Ct. 2445. When a content-neutral ordinance aimed at the secondary effects of protected speech incidentally restricts that speech, courts use the constitutional test employed in *O'Brien*. *See, e.g., City of Erie v. Pap's A.M.*, 529 U.S. 277, 294–302, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000).

Under intermediate scrutiny, the restriction on protected speech must be narrowly tailored. The regulation "need not be the least restrictive or least intrusive means" of effecting the government's purpose. *Ward*, 491 U.S. at 798, 109 S.Ct. 2746. A regulation may not, however, "burden substantially more speech than is necessary to further the government's legitimate interests. Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Id.* at 799, 109 S.Ct. 2746 (citation and footnote omitted). If the regulation burdens substantially more speech than is necessary to further the government's legitimate interests, then the regulation fails either the time, place, and manner test or the *O'Brien* test.

### 2. Commercial speech

Although a regulation which discriminates according to content is presumed unconstitutional, that presumption does not defeat all content-based regulation of commercial speech. In *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), the Court observed that "[t]he Constitution ... accords a lesser protection to commercial speech than to other constitutionally guaranteed expression. The protection available for particular commercial expression turns on the nature both of the expression and of the governmental interests served by its regulation." *Id.* at 562–63, 100 S.Ct. 2343 (citation omitted).

 Usually, the test of whether a particular restriction on commercial speech is permissible is the four-part test first described in *Central Hudson:* (1) whether the regulated commercial speech concerns a lawful activity and is not misleading, (2) whether the restriction seeks to implement a substantial governmental interest, (3) whether the restriction directly advances that interest, and (4) whether the restriction is no more extensive than is necessary to achieve that interest. *Id.* at 566, 100 S.Ct. 2343. A restriction is no more extensive than is necessary to achieve a substantial governmental interest when the restriction is a reasonable " 'fit' between the legislature's ends and the means chosen to accomplish those ends." *Fox*, 492 U.S. at 480, 109 S.Ct. 3028 (quoting *Posadas de Puerto Rico Assocs. v. Tourism Co. of Puerto Rico*, 478 U.S. 328, 341, 106 S.Ct. 2968, 92 L.Ed.2d 266 (1986)).

▪ The test for restrictions on commercial speech in *Central Hudson* is not applied, however, if an ordinance restricts both commercial and non-commercial signs. Rather the more stringent "time, place, and manner" test described above is used. *Cleveland Area Board of Realtors v. City of Euclid*, 88 F.3d 382, 385–86 (6th Cir.1996) (finding such an ordinance content neutral but not narrowly tailored under the time, place, and manner test and

finding that alternative tests of constitutionality were inadequate). Regulations which impose content-based restrictions on commercial speech fail the "time, place, and manner test." *See Discovery Network, Inc.*, 507 U.S. at 428–29, 113 S.Ct. 1505.

## C. *The ordinance and content discrimination*

XXL alleges that the sign ordinance violates the First Amendment by discriminating according to the content of speech and according to the identity of the speaker. Broadview Heights denies many of XXL's claims that the ordinance discriminates according to content. It also claims that any treatment of content in the sign ordinance is constitutionally justified by its zoning and police powers or is a permissible restriction on commercial speech.

### 1. *Content discrimination in the ordinance and non-commercial speech*

### a. *Content-based restrictions on speech in the ordinance*

▇▇▇ The classification of signs upon which the regulations in Broadview Heights' sign ordinance are based is in large part a content-based system of classification. The ordinance uses two variables to classify signs, use types and structural types. A sign's use type is a description of the sign's content. *See* C.O.B.H. §§ 1479.03(a), 1479.03(a)(2)(G). A sign's structural type is a description of the sign's architecture or placement. *See* C.O.B.H. § 1479.03(b). These types are not mutually exclusive. Every sign is classified according to use type and structural type.

The sign ordinance's classification of permanent and temporary signs according to "use types" is explicitly and almost exclusively a classification according to content. Thus, a sign whose content consists of an indication of "the direction pedestri-

an or vehicular traffic is requested to move" is one type of sign, a directional sign, C.O.B.H. § 1479.03(a)(1)(C), while a sign whose content consists of "miscellaneous information intended to serve the public" is another type of sign, an information sign, C.O.B.H. § 1479.03(a)(1)(E). Similarly, a sign which announces a public function is a special event sign, and one which refers "to a political contest, involving candidates and/or issues" is a political sign. C.O.B.H. § 1479.03(a)(2)(D) & (G).

Whether, where, when, and how signs may be erected and maintained differ according to the sign's content-based use type. For example, information signs are allowed in any district with the approval of the Planning Commission, and political signs are allowed in all districts where not otherwise barred by law. C.O.B.H. §§ 1479.03(a)(1)(E), 1479.12(e). Special event signs are the only non-governmental signs that may be erected in the street right of way. C.O.B.H. §§ 1479.03(a)(2)(D), 1479.06(a)(5), 1479.07(h). Information signs may be of any structural type not banned by the sign ordinance, but there may be no more than one information sign per premises, and the sign must not exceed 50% of the largest signage otherwise permitted in the district. C.O.B.H. § 1479.12(d). Directional signs are prohibited in connection with one-family attached dwellings. They are allowed in connection with attached and multifamily dwellings, but only if they are wall or ground signs. C.O.B.H. § 1479.08(a). When allowed in residential districts, there may be no more than one directional sign per dwelling, it must not exceed two square feet of face area, it must be at least five feet from the side lot line, and, if a wall sign, it may be no more than five feet above the ground. C.O.B.H. § 1479.08(b). There are similar restrictions on directional signs in business districts, industrial districts, and community facilities districts.

C.O.B.H. §§ 1479.09(c), 1479.10(c), 1479.11(b). Political signs must be removed within 48 hours of the election to which they are related. C.O.B.H. §§ 1479.19. The content of a sign plays an important role, therefore, in whether, where, when, and how that sign may be displayed under Broadview Heights' sign ordinance.

### b. The extent of content-based restrictions on non-commercial speech

Laws must be substantially overbroad before they will be invalidated on their face. Although facially invalid laws,

> if too broadly worded, may deter protected speech to some unknown extent, there comes a point where that effect—at best a prediction—cannot, with confidence, justify invalidating a statute on its face and so prohibiting a State from enforcing the statute against conduct that is admittedly within its power to proscribe.

*Broadrick,* 413 U.S. at 615, 93 S.Ct. 2908. Especially "where conduct and not merely speech is involved, ... the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick,* 413 U.S. at 615, 93 S.Ct. 2908. If a statute " 'covers a whole range of easily identifiable and constitutionally proscribable ... conduct,' " courts should not find a statute facially invalid merely because "there are marginal applications in which [the] statute would infringe on First Amendment values...." *Parker v. Levy,* 417 U.S. 733, 760, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974) (quoting *United States Civil Serv. Comm'n v. National Ass'n of Letter Carriers AFL–CIO,* 413 U.S. 548, 580–81, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973)). Thus the Supreme Court has struck down statutes as facially overbroad where a statute "does not aim specifically at evils within the allowable area of state control but, on the contrary, sweeps within its ambit other activities that in ordinary circumstances constitute an exercise of freedom of speech or of the press," *Thornhill v. Alabama,* 310 U.S. 88, 97, 60 S.Ct. 736, 84 L.Ed. 1093 (1940), but has refused to find statutes facially overbroad where potentially impermissible applications of the law were not "more than a tiny fraction of the materials within the statute's reach," *Ferber,* 458 U.S. at 773, 102 S.Ct. 3348.

Broadview Heights' sign ordinance substantially curtails non-commercial. speech on the basis of subject matter. The ordinance declares that all signs not conforming with the provisions of the ordinance are nuisances and prohibits any sign not specifically permitted by the ordinance's district-by-district listing of allowed signs. C.O.B.H. §§ 1479.01(b)(2), 1479.07(*l* ). In residential districts the ordinance permits two kinds of permanent signs, nameplate and identification signs. The ordinance also permits temporary real estate signs. C.O.B.H. §§ 1479.08, 1479.12(b)(1)(A) & (3)(A). In business districts the ordinance generally permits two kinds of permanent signs, identification and directional signs, except that gasoline and service stations are allowed to display the price of gasoline and diesel fuel and to display limited types of information at fuel pumps and service islands. The ordinance also allows temporary "sale" window signs of limited surface area in business districts and certain temporary real estate and project signs. C.O.B.H. §§ 1479.09, 1479.12(b)(2) & (3). The ordinance allows permanent identification and directional signs and temporary real estate and project signs in industrial districts. C.O.B.H. §§ 1479.10, 1479.12(b)(1)(C) & (2)(B). In community facilities districts the ordinance permits permanent identification and directional signs and bulletin boards and temporary real estate and project signs. C.O.B.H. §§ 1479.11, 1479.12(b)(1)(C) & (2)(B).

The ordinance permits political signs in all districts. C.O.B.H. § 1479.12(e). The ordinance defines political signs as signs "referring to a political contest, involving candidates or issues."[10] C.O.B.H. § 1479.03(a)(2)(G). However, political signs "relating to issues and/or candidates identified with a specific election" must be removed within 48 hours after the election. C.O.B.H. § 1479.19.

With a few exceptions, *see, e.g., infra,* pp. 787 n. 13, 788–89, the ordinance prohibits all signs other than the signs described above.[11] *See* C.O.B.H. §§ 1479.07(*l*). Because the listing of allowed signs is exclusive and content-based, those non-commercial signs which are not allowed because of use type limitations are disallowed because their content precludes their inclusion in the listing of allowed signs. That is to say, the ordinance curtails non-commercial speech because of its content.

The amount of non-commercial speech prohibited by the ordinance's content-based list of permitted is substantial. For example, the ordinance makes no provision for signs displaying religious,[12] philosophical, informative, congratulatory, expressive, or non-political partisan messages. Such signs as "What would Jesus do?,"

---

10. A court is required to construe an ordinance in any reasonable way so as to avoid a construction which would raise doubts about the ordinance's constitutionality. The Supreme Court has held since *Murray v. The Charming Betsy,* 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208 (1804), that "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Florida Coast Bldg. & Constr. Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988) (citing representative cases). When a court is confronted with a statute or regulation open to several interpretations, "every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." *Id.* (quoting *Hooper v. California,* 155 U.S. 648, 657, 15 S.Ct. 207, 39 L.Ed. 297 (1895)); *see also Crowell v. Benson,* 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932) ("When the validity of [a law] is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided."). A court cannot, however, rewrite statutes to avoid unconstitutionality. *Triplett Grille, Inc. v. City of Akron,* 40 F.3d 129, 136 (6th Cir.1994). This is especially important when a federal court examines state statutes, including municipal ordinances: "A federal court must always be aware of the federalism concerns that arise whenever it deals with state statutes. The principles of federalism forbid a federal ... court to arrogate the power to rewrite a municipal ordinance." *Id.* (quoting *Eubanks v. Wilkinson,* 937 F.2d 1118, 1125 (6th Cir. 1991)). This court must restrict its construction of "political signs" to signs referring to a political contest, as that is the plain meaning of the ordinance.

11. The ordinance contains a provision which would allow an individual to obtain a permit to erect, place, paint, relocate, or alter a sign. A permit may not issue, however, for a sign which deviates from the restrictions imposed by the ordinance. According to C.O.B.H. § 1479.13(e):

> In the event the application [for a permit] complies with the provisions of this chapter, the [Architectural Review] Board shall make its recommendation of the proposed sign to the Council. Council shall then approve or reject such application. If approved by the Council, the Commissioner shall issue the sign permit. Council shall not approve a sign that does not conform to these regulations and shall not reject a sign that does conform to these regulations.

The ordinance contains no mechanism whereby an exception could be made to allow the posting of a sign which does not satisfy the express requirements of the ordinance.

12. Religious expression is fully protected under the First Amendment. *See Capitol Square Review & Advisory Bd. v. Pinette,* 515 U.S. 753, 760, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995)

"Know yourself," "It's a girl!," "Happy birthday, son!," "Celebrate life," or "Go Ohio State!" are not permitted by the ordinance.[13] The ordinance also makes no provision for signs addressing non-governmental social action, including such signs as "Donate blood," "Give to the March of Dimes," and "Be a Big Sister." [14]

Even more troubling is the ordinance's prohibition of signs addressing political and social issues which do not refer to a particular political contest. Such signs as "No war with Iraq," "Down with affirmative action," "Register guns, not aliens," and similar declarations addressing issues salient or potentially salient to the body politic do not fit within the content-based list of signs permitted by the ordinance if they do not refer, at least impliedly, to a particular political contest. Thus, the only political or social issues which may be addressed are those which are already found sufficiently salient by mainstream thought that they are the subject of an election or other vote. Individuals concerned with any other issue are barred from expressing their political and social concerns by means of signs.

Moreover, even signs related to issues or candidates identified with a specific election must be removed 48 hours after that election. On its face, such a prohibition bars supporters of the losing side of a referendum from posting signs designed to convince passers-by to change their minds on the issue and bars supporters of the winning side from posting signs designed to maintain public support for their position. Similarly, the prohibition would have prevented supporters of Al Gore after the

2002 presidential election from displaying after the election signs supporting his candidacy as a protest against the election's outcome and manner of decision. These prohibitions strike at the core of our First Amendment freedoms, the freedom to speak about matters of political concern. *See Republican Party of Minnesota,* 536 U.S. at 773–, 122 S.Ct. at 2534; *see also Boos,* 485 U.S. at 318, 108 S.Ct. 1157.

Broadview Heights' ordinance not only bans a substantial amount of non-commercial speech, but it also subjects such speech, including political speech within the meaning of the ordinance, to burdens that it does not impose on some kinds of commercial speech. A business may erect a sale sign of up to five square feet in area without a permit, but an individual seeking to erect a political sign of five square feet in area must pay $100.00 and apply for permission to erect the sign from the Building Commissioner. C.O.B.H. § 1479.13. The application for such a sign must include the following, using "photographs and drawings at a scale which clearly shows the details and design of the sign":

(1) The design and colored layout of each sign proposed, including the total area of all signs and the area, height, character, materials, colors and type of lettering or other symbols of individual signs. Material samples may be requested.

(2) Photographs or drawings of the building for which the signs are proposed;

---

13. The ordinance is not entirely clear on this point. Individuals may erect a temporary sign announcing a garage sale "or other similar signs of a personal nature...." C.O.B.H. § 1479.13(b)(3). It is not clear which temporary personal signs are allowed because they are similar to garage sale signs. By any interpretation of the ordinance, however, *perma-*nent signs expressing personal points of view which are unconnected to a political campaign are prohibited.

14. Plaintiff is correct in asserting that a sign allegedly posted at one time on the Tallyho Motel, "American owned," would be prohibited by the ordinance.

(3) The number and types of lamps and lens material to be used in any illuminated signs and data showing that the illumination meets the standards established in Section 1479.05(d), including rays to illuminating areas;

(4) A dimensional site plan and building elevation showing the exact locations of each sign in relation to the building and property lines. Also included shall be the dimensions of the width of the building or building unit face or faces and the lot or lots not occupied by buildings, all used for calculation purposes. The sign and locations of existing signs shall not be included in the calculations thereunder.

(5) Details and specifications for construction, erection and attachment as may be required by the Building Code, including the name of the sign contractor or company.

C.O.B.H. § 1479.13(c). The applicant for such a sign must also post a bond or cash deposit at the time of application to guarantee the cost of removal. C.O.B.H. § 1479.13(f)(2). Depending upon the type of temporary political sign of area greater than three square feet sought, permission to erect the temporary sign may be granted for as short as 30 days or as long as a year. C.O.B.H. § 1479.13(f)(1). Businesses seeking temporary development signs and temporary identification signs are not, however, required to post a deposit and are not subject to the time limitations of C.O.B.H. § 1479.13(f)(1). C.O.B.H. § 1479.13(f)(4). Moreover, a homeowner may display without a permit a temporary "For Sale" or "For Lease" sign but not a temporary sign stating a point of view on political or social issues not connected with a political campaign. C.O.B.H. § 1479.13(b)(1).

Finally, the ordinance accords differing treatment to differing kinds of noncommercial speech depending upon their content. Signs which "perform a public service function such as indicating time or temperature" may "revolve, rotate, whirl, spin, flash, sparkle or otherwise make use of motion to attract attention," but political signs and other signs may not. C.O.B.H. § 1479.05(e). Signs which display information intended to serve the public may be internally illuminated, but political signs and other signs may not. C.O.B.H. §§ 1479.03(a)(1)(E), 1479.07(j). Identification signs in residential districts may be illuminated with the approval of the Planning Commission, but political signs may not. C.O.B.H. § 1479.08(c)(1). Churches and other non-profit groups may receive approval to use portable or mobile signs; individuals wishing to express a political message or some other message may not. C.O.B.H. § 1479.12(c)(6)(A) & (B). Signs or displays which include the following non-commercial content are exempted from all requirements of the sign ordinance, although political signs are not:

(a) Cornerstones and permanent building plaques, displaying the date of construction, the building name, or similar information;

(b) Display of official public notices, the flag and an emblem or insignia of an official government body;

(c) Holiday decorations for customary periods of time;

(d) Signage which is not advertising and which is an integral part of the original construction of vending machines, fuel pumps or similar devices;

(e) Street name signs; and

(f) Special signage determined by the Architectural Review Board to be reasonable considering the intent and regulations of this chapter.

C.O.B.H. § 1479.18.

In sum, Broadview Heights' sign ordinance uses content-based distinctions to

ban, abridge, or burden a substantial amount of non-commercial speech including "classically political speech." *Boos,* 485 U.S. at 318, 108 S.Ct. 1157. Its content-based distinctions severely limit the use of residential signs, "a venerable means of communication that is ... an important and distinct medium of expression," *City of Ladue v. Gilleo,* 512 U.S. 43, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994), and impose burdens on non-commercial speech that they do not impose on commercial speech. The ordinance also makes content-based distinctions between non-commercial signs by allowing certain kinds of displays depending upon content, allowing certain kinds of displays depending upon the speaker, and providing exemptions from restrictions depending upon content.[15] The overbreadth of Broadview Heights' sign ordinance "does not aim specifically at evils within the allowable area of state control but, on the contrary, sweeps within its ambit other activities that in ordinary circumstances constitute an exercise of freedom of speech...."

*Thornhill,* 310 U.S. at 97, 60 S.Ct. 736. The ordinance's overbreadth reaches considerably more than a tiny fraction of the speech within the reach of the statute. For this reason, the ordinance is substantially overbroad.

### c. Content-based restrictions on non-commercial speech and strict review

■ Because the ordinance makes content-based distinctions in restricting speech, the ordinance must pass the test of strict review to be constitutional. The content-based restrictions on non-commercial speech in Broadview Heights' sign ordinance do not pass that test. The restrictions in the ordinance do not serve a compelling state interest, and they are not narrowly tailored to serve their ostensible interests. The ordinance makes clear that the interests served by the ordinance are traffic safety, aesthetics, and the protection of property values and "neighborhood character."[16] C.O.B.H. § 1479.01(a). No court has found any of these concerns to be a compelling government interest suffi-

---

15. Broadview Heights may not claim that these "exemptions" expand speech by removing restrictions and that, as "expansions" of speech, the exemptions are not content-based distinctions. A content-based exemption is no less a content-based distinction because it is phrased as exempting certain speech from a restriction rather than as imposing the restriction only on the burdened class of speech. *See, e.g., City of Ladue,* 512 U.S. 43, 114 S.Ct. 2038, 129 L.Ed.2d 36 (overturning an ordinance which granted content-based exemptions to a general ban on residential signs to "for sale" and residential identification signs but not political signs); *Dimmitt,* 985 F.2d 1565 (affirming a lower court ruling overturning as content-based and, therefore, impermissibly overbroad an ordinance regulating the display of signs, flags, and other forms of iconic speech but exempting government flags); *Matthews v. Town of Needham,* 764 F.2d 58 (1st Cir.1985) (overturning an ordinance which prohibited outdoor signs except those pertaining to the premises or to products or services on the premises as impermis-

sibly affording greater protection to commercial than political speech).

16. Ultimately, traffic safety and aesthetics are the core interests served by the ordinance. While C.O.B.H. § 1479.01(a)(1) & (5) justify the restrictions in the ordinance in terms of maintaining the quality of residential districts and preventing undesirable impacts on property values and neighborhood character, C.O.B.H. § 1479.01(b) explains that the cause of residential deterioration and of declines in property values and neighborhood character is in the end an aesthetic problem of the city's appearance:

> As the appearance of the City is marred by the excessive number, oversized and poorly designed signs, both residential and business property values are adversely affected. Therefore, the number of such distracting signs ought to be reduced and signs permitted should comply with the standards of this chapter in order to reduce the aforementioned effects.

cient to withstand strict scrutiny. *See Playboy Entm't,* 529 U.S. at 815, 120 S.Ct. 1878 ("[T]he lesser scrutiny afforded regulations targeting the secondary effects of crime or declining property values has no application to content-based regulations targeting the primary effects of protected speech."); *City of Ladue,* 512 U.S. at 48, 114 S.Ct. 2038 (affirming a lower court decision which found that interests in traffic safety, aesthetics, and neighborhood preservation were not sufficiently compelling to support content-based restrictions on speech); *Whitton v. City of Gladstone,* 54 F.3d 1400, 1408 (8th Cir.1995). Broadview Heights cites no government interest implicated by the sign ordinance which might be said to be a compelling interest. For this reason alone, Broadview Heights' content-based restrictions on non-commercial signs fail the test of strict scrutiny.

■ But Broadview Heights' content-based restrictions on non-commercial signs fail strict review for a second reason. The content-based restrictions are not narrowly drawn to achieve the ends of traffic safety, aesthetics, and the protection of property values and "neighborhood character." For example, identification signs permit "the name and address of a building, development, public or semipublic facility, business, office or industrial establishment. Such signs may also include the names of tenants, general type of goods sold, or services rendered...." C.O.B.H. § 1479.03(a)(1)(D). Identification signs may not include "the listing of specific goods or services, brand names, prices, 'sale' or telephone numbers...." *Id.* There is no obvious justification arising from traffic safety, aesthetics, or the protection of property values and neighborhood character as to why certain information is prohibited on identification signs and other information is not. On the face of it, a concern for the quantity of information on a sign, rather than its content,

would seem more likely to promote traffic safety and aesthetics.

The sign ordinance contains many similar examples of content-based restrictions which are not narrowly drawn to further the espoused ends of the ordinance. The ordinance does not permit most signs to "revolve, rotate, whirl, spin, flash, sparkle or otherwise make use of motion to attract attention...." C.O.B.H. §§ 1479.05(e), 1479.07(c). But a sign which performs a public service function may do all of these things. Signs may not be illuminated, unless they are information signs. C.O.B.H. § 1479.07(j). Temporary signs must be located a minimum of 100 feet from a property line in a residential neighborhood (thus effectively banning many temporary signs on smaller residential lots), unless the signs are real estate signs. C.O.B.H. § 1479.12(c)(1). One information sign may be erected in any district, but it may not exceed 50% of the largest signage otherwise permitted in the district. C.O.B.H. § 1479.12(d). A permit is not required for temporary signs giving directions or an address, but a temporary sign which is more than three square feet in area and concerns a project or a special event requires a permit. C.O.B.H. § 1479.13. A directional sign in a residential district may rise five feet from the ground, but a nameplate in a residential district may rise only four feet from the ground. C.O.B.H. § 1479.08(b). A sign is permitted near the service entrance of a multi-unit building in business districts in addition to all other permitted signage, but only if the sign displays the business name and address of the unit. C.O.B.H. § 1479.09(d)(3). In a business district the only information which may be displayed on an awning is the name of the business. C.O.B.H. § 1479.09(d)(10). An identification sign in an industrial district may have a face area of 50 square feet, but the face area of a directional sign in the same district is limited to two square feet. C.O.B.H.

§ 1479.10(c). An additional sign is permitted to industrial parks and multibuilding developments in industrial districts, but only if the sign displays the name and address of the industrial park and multibuilding development and nothing more. C.O.B.H. § 1479.10(d)(2). A unit in a community facilities district may erect a bulletin board or an identification sign as a wall sign, but the unit may not erect a directional sign as a wall sign. C.O.B.H. § 1479.11(a). A one-family dwelling in a residential district may erect a permanent nameplate or identification sign but not a permanent political sign. C.O.B.H. §§ 1479.07(a)(1)(C) & (F), 1479.08(a), 1479.19. Displays of official public notices, the flag, and the emblem of an official government body are exempt from the provisions of the sign ordinance. C.O.B.H. § 1479.18(b). One may display holiday decorations unconstrained by the restrictions of the ordinance, except that such displays may only last "for customary periods of time." C.O.B.H. § 1479.18(c).

The above content-based restrictions on whether, when, where, and how a sign may be displayed have little connection with traffic safety and aesthetics. Whether a moving sign displays the time or "25% off," whether an illuminated sign displays travel information or an exhortation to give blood, whether a temporary sign announces a house for sale or urges a ban on handguns, or whether an awning sign announces the name and address of a firm or declares "Lawyers for Christ" has no obvious connection to traffic safety and aesthetics and little obvious connection to the preservation of property values.

Some of the provisions of the sign ordinance are entirely puzzling given the expressed purposes of the ordinance. For example, community special event signs may be displayed only for two weeks, after which time they become, one must suppose, a threat to safety, aesthetics, and neighborhood character. C.O.B.H. § 1479.12(c)(5). Other provisions are more disturbing. The ordinance bans portable or mobile signs in furtherance of the ordinance's espoused goals but allows churches or a non-profit organizations to display such signs. C.O.B.H. § 1479.12(c)(6). The ordinance does not explain how the nature of the organization displaying the portable sign changes its relationship to the purposes for which the sign ordinance was created.

The sign ordinance is riddled with innumerable instances such as those above in which a change in a sign's content affects whether, when, where, or how that content may be displayed. Why a change in the content of a sign makes the sign more or less of a threat to safety, aesthetics, or property values, thus justifying differential treatment of the sign under the sign ordinance, is a mystery that the ordinance does not solve. The number of signs, their size, the quantity of information on them, their color and placement, and the limitation of such structurally distracting signs as moving and illuminated signs to certain areas of the city would seem to do far more to promote traffic safety, aesthetics, and property values than the regulation of the content of signs.

Broadview Heights could have chosen to regulate non-commercial signs by addressing solely the size, number, frequency, movement, illumination, structural characteristics, and other purely physical qualities of signs. It chose to allow the content of signs affect how signs are regulated. This is permissible as long as the regulations Broadview Heights adopts are narrowly tailored to serve compelling government interests. Broadview Heights offers no interests implicated by its sign ordinance which courts have accepted as compelling. And the content-based regulations in the ordinance vary from reasonably related to the expressed

interests served by the sign code to apparently unrelated to those interests. Few of the content-based regulations in the sign ordinance are narrowly tailored to the expressed interests served by the ordinance.[17] For these reasons, the sign ordinance's restrictions on non-commercial signs fail the test of strict scrutiny.

Defendant cannot argue that the restrictions on non-commercial speech in its ordinance should be evaluated by means of a "time, place, and manner" test. The content-based restrictions in the classification according to use types permeates the entire sign ordinance. A time, place, and manner test is inappropriate when restrictions on speech are content-based. Moreover, even if a time, place, and manner test were appropriate, the ordinance would fail such a test. A time, place, and manner test requires that the restrictions on speech must not be based on the content of the message and must be narrowly tailored to serve a significant governmental interest. As has already been seen, the restrictions in Broadview Heights' sign ordinance are based on the content of messages and are not narrowly tailored to serve their ostensible interests. Even if a time, place, and manner test were appropriate in evaluating the restrictions on non-commercial speech in Broadview Heights' sign ordinance, the ordinance would fail that test.

### 2. Content discrimination in the ordinance and commercial speech

XXL argues that Broadview Heights impermissibly distinguishes among commercial signs according to their content. Broadview Heights replies XXL does not have standing to challenge any content-based distinctions in the sign ordinance. As has already been shown, this argument is unavailing.

#### a. Standard of review

■ Broadview Heights' sign ordinance regulates both commercial and non-commercial speech. The test described in *Central Hudson* is, therefore, inappropriate, and the more stringent time, place, and manner test should be used in evaluating the restrictions on commercial speech in the ordinance. That is, the restrictions must not be based on the content of the message, must be narrowly tailored to serve a significant governmental interest, and must leave open ample alternatives for communication.

#### b. Restrictions on commercial speech and the time, place, and manner test.

■ The restrictions on commercial speech in Broadview Heights' sign ordinance fail the time, place and manner test in two respects: They are based on the content of messages and they are not narrowly tailored to serve the interests which justify them.

#### 1. Content-based restrictions on commercial speech

Four use categories of permanent sign and six use categories of temporary sign apply in whole or part to commercial speech. These are permanent billboards, bulletin boards, identification signs, and nameplates and temporary project signs, real estate signs, sale signs, special event signs,[18] specific product signs, and tempo-

---

17. An example of a content-based regulation which *is* narrowly tailored to the interests served by the ordinance is the ban on signs which are visible from the sight lines along a street and which use language which makes

them resemble traffic control signs or signals. *See* C.O.B.H. § 1479.06(f).

18. It is not entirely clear whether commercial messages may be displayed on special event signs. The signs are those "announcing a

rary identification signs. *See* C.O.B.H. § 1479.03(a). One of the use categories applicable to commercial speech itself regulates the content of the speech which may appear on the sign. An identification sign, defined as "indicating the name and address of a building, development, public or semi-public facility, business, office or industrial establishment" may not list "specific goods or services, brand names, prices, 'sales' or telephone numbers...." C.O.B.H. § 1479.03(a)(1)(D).

Other portions of the ordinance also regulate the content of commercial speech. Advertising is not permitted on parked vehicles unless the vehicle is a commercial delivery or service vehicle and the advertising relates to the business in which the vehicle is involved. C.O.B.H. § 1479.07(a). Persons wishing permanently to display in business districts the information allowed on identification signs may use ground signs in a local retail district, canopy signs in shopping centers, and window and wall signs in a general commercial district, but not other structural types of signs to display that information. C.O.B.H. § 1479.09(a). Identification signs in business districts may include a listing of the general types of goods sold and services rendered, but identification signs in office districts may not. C.O.B.H. § 1479.09(d)(7). If an establishment located in a business district displays its business name and address on permanent plate not exceeding two square feet in area affixed on or near the service entrance of the establishment, the sign will be permitted in addition to the otherwise-allowable maximum sign area allowed in business districts. C.O.B.H. § 1479.09(d)(3). Temporary signs announcing sales are limited to up to 10% of each window of an individual building unit, not to exceed 30% of the building unit's permitted area for wall

public function...." C.O.B.H. § 1479.03(a)(2)(D). Whether an event held

identification signage. C.O.B.H. § 1479.09(d)(9). Signs announcing sales are prohibited except when secured to windows and doors of a main building. *Id.* An establishment in a business district may display the name of the business in letters not exceeding eight inches high on the front and side of awning but may not display other information on the awning. C.O.B.H. § 1479.09(d)(10). Each permitted identification or directional sign in a business district is limited in number according to use type and structural type and must satisfy requirements regarding maximum size, maximum height, minimum setback, and other requirements. C.O.B.H. § 1479.09(c). The ordinance imposes similar restrictions according to use type in industrial districts and community facilities districts, *see* C.O.B.H. §§ 1479.10, 1479.11, and imposes similar restrictions on temporary signs according to use type. *See* C.O.B.H. § 1479.12(b).

The sign ordinance places content-based restrictions on commercial speech in addition to those made on the basis of use type. For example, signs which "perform a public service function such as indicating time or temperature" may "revolve, rotate, whirl, flash, sparkle or otherwise make use of motion to attract attention," but signs which contain other information may not move. C.O.B.H. § 1479.05(e). Non-profit organizations "and/or churches" may use portable or mobile signs, but other speakers may not. C.O.B.H. §§ 1479.07(f), 1479.12(c)(6)(A). Signs which present "miscellaneous information intended to serve the public" such as "travel information, vehicle service, weather, time, historic and scenic sites, [and] recreation facilities," C.O.B.H. § 1479.03(a)(E), may be internally illuminated, but signs containing other information may not be. C.O.B.H.

for profit is a "public function" within the meaning of the ordinance is not known.

§ 1479.07(j). The front and side portions of awnings may contain the name of the business in the building but not other information. C.O.B.H. § 1479.09(d)(10). Building identification signs may be placed only near the main entrances of buildings. C.O.B.H. § 1479.09(d)(12)(A). Signs identifying individual tenants in a multiple tenant building may be placed only on the ground and may only identify the tenants, the building, and the address. C.O.B.H. § 1479.09(d)(12)(B). Hotels, motels, and restaurants in office laboratory and light industrial districts have special limitations on their maximum area of allowed signage. C.O.B.H. § 1479.10(b)(3). In industrial districts, "[m]ulti-unit building service entrances may be identified by the business name and address on a permanent nameplate, not exceeding two square feet in single sign face area and located on or near the service entrance." C.O.B.H. § 1479.10(d)(3). "Grand-opening or community special event signs shall not be displayed for a period of greater than two weeks." C.O.B.H. § 1479.12(c)(5).

Gasoline stations and automotive service stations are singled out for special restrictions on the basis of content:

*Gasoline and automobile service stations.* Such signs shall conform to the district regulations in which they are located, except as permitted below.

A. All gasoline and service stations shall be permitted one free-standing permanent identification sign for and on each street the station fronts on.

B. The maximum sign face area for each sign displaying only the price of gasoline and diesel fuel is four square feet per type. No more than two fuel price signs shall be permitted per street frontage. The sign face area for price signs shall be part of the identification sign requirement. No other specific goods price signs are permitted....

D. Permanent information signs at fuel pumps and service islands are permitted. Such signs shall be limited to the display of information regarding the type of service provided and other information essential in directing and instructing the motoring public, as approved by the Planning Commission.

C.O.B.H. § 1479.09(d)(4).

In sum, content-based distinctions in the sign ordinance pervade the ordinance and are the basis for much of the ordinance's regulation of commercial speech. Signs are classified according to use types largely on the basis of the kind of information carried by the sign, and commercial speech on signs is regulated and restricted in part according to use type classification. The sign ordinance also contains an abundance of content-based restrictions on commercial speech in addition to those made on the basis of use type.

*2. Content-based restrictions on commercial speech not narrowly tailored*

As already noted, the sign ordinance is intended to promote traffic safety, improve aesthetics, and protect property values and neighborhood character. C.O.B.H. § 1479.01(a). Because the ordinance uses content-based restrictions on protected speech, the burden is on the defendants to show that the ordinance does not unnecessarily circumscribe protected expression. Defendants do not even attempt to shoulder this burden.

Few of the content-based restrictions on commercial speech in the Broadview Heights sign ordinance are narrowly tailored to the espoused purposes of the sign ordinance. Broadview Heights might argue that a ban on commercial signs is one of several measures necessary to preserve

the character of residential neighborhoods. But it is difficult to understand how the conglomeration of content-based distinctions regarding what can and cannot be said by means of commercial signs are necessary restrictions on commercial speech. Common sense says that a large area of signage, signage crowded with text, or interminably posted "temporary" signs may threaten traffic safety by posing distractions and may offend aesthetic sensibilities. But the content-based restrictions of the ordinance sections listed above would seem to do little to ameliorate these problems. Restricting the area of allowable signage, imposing minimum limits on letter size and spacing, and limiting the time during which temporary signs are displayed are allowable, content-neutral means which would achieve the city's ends. *City of Ladue*, 512 U.S. at 48, 114 S.Ct. 2038 ("[G]overnments may regulate the physical characteristics of signs—just as they can, within reasonable bounds and absent censorial purpose, regulate audible expression in its capacity as noise."). Banning signs which advertise products sold off-site is also an allowable means of reducing the proliferation of signs. *See Metromedia*, 453 U.S. at 511–12, 101 S.Ct. 2882 (citing cases). Banning particular content from signs would seem to do relatively little to serve the interests of traffic safety, aesthetics, property values, and preserving neighborhood character. Broadview Heights provides no evidence to the contrary.

Broadview Heights fails to carry its burden to show that the ordinance does not unnecessarily circumscribe protected expression. The court must conclude that the restrictions in Broadview Heights' sign ordinance are not narrowly tailored to serve their espoused ends. Because the ordinance uses content-based distinctions to restrict protected speech and because the restrictions in the ordinance are not narrowly tailored to serve their espoused

ends, the sign ordinance fails the time, place, and manner test appropriate when an ordinance regulates both commercial and non-commercial speech.

### D. The ban on pole signs

XXL contends that Broadview Heights ban on pole signs is impermissibly selective and forecloses an entire medium of expression. Broadview Heights replies that the pole sign prohibition is a reasonable, content-neutral regulation which does not violate the First Amendment.

The ordinance defines a pole sign as "[o]ne free-standing with one or not more than two faces, which is supported wholly by a pole or poles designed to allow pedestrian or similar access thereunder." C.O.B.H. § 1479.03(b)(3). The ordinance prohibits pole signs. C.O.B.H. § 1479.07(e). The ordinance exempts, however, certain signage from the restrictions of the ordinance, including the prohibition against pole signs. Official public notices, the flag, the emblem or insignia of an official government body, holiday decorations, street name signs, and "[s]pecial signage determined by the Architectural Review Board to be reasonable considering the intent and regulations" of the ordinance may be displayed by means of pole signs. C.O.B.H. § 1479.18.

While the language of the prohibition on pole signs is of itself content-neutral, all the exemptions to the prohibition are content-based. As has already been discussed, a content-based exemption is no less a content-based distinction because it is phrased as exempting certain speech from a restriction rather than as imposing the restriction only on the burdened class of speech. *See supra* p. 786, n. 11. Because Broadview Heights' pole sign prohibition treats non-commercial signs differently depending upon their content, XXL's challenge by means of the doctrine of over-

breadth to the pole sign's effects on non-commercial speech must be examined using strict scrutiny.

■ The selective ban on pole signs in Broadview Heights' sign ordinance does not pass that test. As already described, none of the interests underlying the sign ordinance is a compelling state interest. Moreover, Broadview Heights does nothing to assume its burden of showing that the selective ban on pole signs is narrowly tailored to serve the ordinance's espoused interests. The connection between traffic safety and aesthetics and the selective proscription of certain content on pole signs is not obvious: "It cannot be said that the government's pole signs—whether they are for the city recreational complex or city hall—are somehow less distracting or more pleasing to the eye than the pole sign of a private individual or business." *North Olmsted Chamber of Commerce v. City of North Olmsted*, 86 F.Supp.2d 755, 774 (N.D.Ohio 2000).

Broadview Heights could serve its safety interests by limiting the height, location, and number of pole signs without reference to their content. Similarly, if the city can show that there are ample alternative channels of communication, the city can ban all pole signs without exception, *Gilleo*, 512 U.S. at 54–55, 114 S.Ct. 2038, or ban all commercial pole signs, *Metromedia*, 453 U.S. at 506–12, 101 S.Ct. 2882. But unless it shows a compelling state interest and shows that a selective ban on pole signs on the basis of content is the least restrictive means of serving that interest, it cannot selectively ban pole signs on the basis of content. For this reason, the selective ban on pole signs in the Broadview Heights sign ordinance fails to pass constitutional muster.

The prohibition on pole signs and its exemptions are facially overbroad. Moreover, that overbreadth is real and substantial in that there is "a realistic danger that

the ordinance itself will significantly compromise recognized First Amendment protections of parties not before the Court." *Taxpayers for Vincent*, 466 U.S. at 801, 104 S.Ct. 2118. The court cannot construe the ordinance so as to avoid constitutional problems with regard to pole signs. There is no reasonable interpretation of the ban on pole signs at C.O.B.H. § 1479.07(e) and of the exemption from the restrictions of the ordinance, including the prohibition against pole signs at C.O.B.H. § 1479.18 which would avoid unconstitutionality. Finally, it is not possible for a court to sever the unconstitutional portions of the ordinance from the constitutional portions of the ordinance because it is not apparent what legislative intent the court should honor by severance. *See infra*, pp. 805–06. For these reasons, the prohibition on pole signs and the exemption from the restrictions of the ordinance are, when read together, unconstitutional by application of the doctrine of overbreadth.

■ The prohibition on pole signs and the exemption from the restrictions of the ordinance are unconstitutional, however, even without resort to the doctrine of overbreadth. XXL also challenges the ban on pole signs as applied to its own commercial speech. Again, because Broadview Heights' sign ordinance regulates both commercial and non-commercial speech, the time, place, and manner test is used to evaluate the restrictions on commercial speech in the ordinance. That is, the restrictions must not be based on the content of the message, must be narrowly tailored to serve a significant governmental interest, and must leave open ample alternatives for communication.

The prohibition on pole signs and the related exemptions do not pass the time, place, and manner test because the exemptions are content-based. That is, they provide exemptions from the restrictions of

the sign ordinance depending upon the content of the message or depending upon the entity displaying the message. Because the prohibition on pole signs and the related exemptions fail the time, place, and manner test, they are unconstitutional as applied to XXL's commercial speech.

### E. The ordinance and prior restraint

XXL argues that the ordinance's permit requirements constitute an impermissible prior restraint on speech. Broadview Heights replies that its permit scheme is a valid, content-neutral use of its police powers aimed at the secondary effects of First Amendment activity rather than at the activity itself.

#### 1. Permits and prior restraint

When a government body "imposes any prerequisite to engaging in constitutionally protected expression, that body is said to have imposed a 'prior restraint' on speech." *Ohio Citizen Action v. City of Avon Lake*, 986 F.Supp. 454, 462 (N.D.Ohio 1997) (citing *Freedman v. Maryland*, 380 U.S. 51, 54, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965)). "Prior restraints are not unconstitutional per se." *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975). Prior restraint of protected speech, however, bears a "heavy presumption against its constitutional validity." *Id.* (citing *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963)).

Any permit scheme is invalid if it vests standardless discretion to grant or deny a permit in the hands of government officials. *Nightclubs, Inc. v. City of Paducah*, 202 F.3d 884, 890 (6th Cir.2000). A permit scheme must also meet certain procedural requirements depending upon whether the scheme is content-based or content-neutral. Any permit scheme which considers content in deciding whether to grant a permit "presents peculiar dangers to constitutionally protected speech." *Thomas*, 534 U.S. at 321, 122 S.Ct. 775 (quoting *Freedman*, 380 U.S. at 57, 85 S.Ct. 734). Such a scheme will constitute an impermissible prior restraint on speech unless it contains three procedural safeguards:

> (1) any restraint prior to judicial review can be imposed only for a specified brief period during which the status quo must be maintained; (2) expeditious judicial review of that decision must be available; and (3) the censor must bear the burden of going to court to suppress the speech and must bear the burden of proof once in court.

*Thomas*, 534 U.S. at 321, 122 S.Ct. 775 (quoting *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 227, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990)); *see also Nightclubs*, 202 F.3d at 889–90. If a permit scheme does not consider content in deciding whether to grant a permit, then it need not contain the third procedural safeguard, *i.e.* that the censor must bear the burden of going to court and the burden of proof in court. The first two procedural requirements, however, are necessary to a valid permit scheme regardless of whether the scheme considers message content.

In the Sixth Circuit[19] the criteria for determining whether expeditious judicial review is available to applicants are particularly stringent. "[A] licensing scheme must reasonably ensure a prompt judicial *determination*, and not mere access to judicial review." *Nightclubs*, 202 F.3d at 892 (emphasis added). Moreover, prompt judicial review must be guaranteed: "[A] theoretical possibility of expeditious judi-

**19.** There is a circuit split on the question of whether "expeditious judicial review" means a prompt judicial determination or the prompt commencement of judicial proceedings. *See Thomas*, 534 U.S. at 326–26, 122 S.Ct. 775 (citing cases among circuit courts).

cial review is not constitutionally sufficient. A guarantee of prompt judicial review is necessary 'because undue delay results in the unconstitutional suppression of protected speech.' " [20] *Id.* (quoting *FW/PBS,* 493 U.S. at 228, 110 S.Ct. 596). The requirement of prompt judicial review is not satisfied merely "because an aggrieved applicant or licensee may seek preliminary injunctive relief soon after filing an original action in ... court." *Nightclubs,* 202 F.3d at 892. The Sixth Circuit recognizes the difficulty that municipalities may have in guaranteeing the requisite judicial review:

> Quite obviously, a municipality has no authority to control the period of time in which a state court will adjudicate a matter. Indeed, a city does not even possess the authority to create a mere "avenue" for prompt judicial review; the availability of judicial review is, in effect, dependent upon state law. We recognize that, as a practical matter, the requirement of prompt judicial review means that a city seeking to impose a licensing scheme must take certain steps to avoid constitutional infirmities. Specifically, a city may very well have to go beyond merely maintaining the status quo and actually permit the communication of protected expression until a judicial decision is rendered on a matter. For example, an ordinance could provide that a license shall issue if a reviewing court fails to reach a decision within a reasonably brief period of time. Similarly, a city could also issue provisional licenses to those businesses and employees who choose to seek judicial review of license denials.

*Id.* at 893–94 (citations and footnote omitted). But "[w]hile these measures may seem burdensome on first blush, they are reasonable in light of the great importance

this nation attaches to the freedom of expression." *Id.* at 894.

2. *The permit scheme in Broadview Heights' sign ordinance*

Most of the provisions of the permit scheme in the Broadview Heights sign ordinance are found at C.O.B.H. § 1479.13:

> Applications for permits to erect, place, pain, relocate or alter a sign shall be made to the Building Commissioner or his or her designee by the owner, lessee or developer of the property or his or her authorized representative. The application shall be submitted on forms furnished by the City and may be made either separately or with the application for a permit for a building. The fee shall be one hundred dollars.

> (a) *Permit Required.* A permit shall be required for all permanent and temporary signs with the exception of those signs listed in subsection (b) hereof, Section 1479.18 and those expressly permitted in these Codified Ordinances.

> (b) *Permit Not Required.* A permit is not required for any temporary sign listed which is under three square feet or is listed below, provided that the sign is located on the lot relating to the sign. However, all such signs shall be subject to the applicable regulations in this chapter.

> (1) A temporary sign for the sale or lease of a one- or two-family dwelling or of one lot intended for such a dwelling;

> (2) A business sale sign, not exceeding five feet square in area, displayed as an inside temporary window sign, as defined in Section 1479.03(a)(2)E;

---

**20.** A delay of five months is impermissible. *See Nightclubs,* 202 F.3d at 892.

(3) Garage sale or other similar signs of a personal nature in a residential district, not exceeding three square feet; and

(4) A temporary directional sign that conforms to Section 1479.12(b)(3)A and Section 1479.12(c)(4). (Adopting Ordinance)

(5) A temporary address sign as specified in Section 1479.20. . . .

(c) *Contents of Applications.* Each application shall present the information required below through the use of photographs and drawings at a scale which clearly shows the details and design of the sign.

(1) The design and colored layout of each sign proposed, including the total area of all signs and the area, height, character, materials, colors and type of lettering or other symbols of individual signs. Material samples may be requested.

(2) Photographs or drawings of the building for which the signs are proposed;

(3) The number and types of lamps and lens material to be used in any illuminated signs and data showing that the illumination meets the standards established in Section 1479.05(d), including rays to illuminating areas;

(4) A dimensional site plan and building elevation showing the exact locations of each sign in relation to the building and property lines. Also included shall be the dimensions of the width of the building or building unit face or faces and the lot or lots not occupied by buildings, all used for calculation purposes. The sign and locations of existing signs shall not be included in the calculations thereunder.

(5) Details and specifications for construction, erection and attachment as may be required by the Building Code, including the name of the sign contractor or company.

(d) *Application Review.* The Building Commissioner shall examine the application and verify conformance with the requirements of this chapter, as well as the location and relationship to signs currently existing. He or she shall then forward the application and drawings to the Architectural Review Board. The Board shall review the application and drawings for appropriateness of size, scale, shape, color, and illumination in relation to building size. Conflicting applications for the same development area shall be resolved by the Board. Permanent signs shall take precedence over temporary signs.

(e) *Application Approval.* In the event the application complies with the provisions of this chapter, the Board shall make its recommendation of the proposed sign to Council. Council shall then approve or reject such application. If approved by Council, the Commissioner shall issue a sign permit. Council shall not approve a sign that does not conform to these regulations and shall not reject a sign that does conform to these regulations.

(f) *Temporary signs.* In addition to the other sign requirements, temporary signs shall be issued for the following periods and are renewable by action of Council.

(1) *Time limit.*

A. Wall, one sign per lot or unit sixty days;

B. Ground, one sign per street one year; and

C. Portable or mobile, thirty days, provided that notwithstanding any other provision of this chapter, said time period shall not be renewable

until the calendar year following the year in which said use occurred.

(2) *Bond or cash deposit.* A bond or cash deposit shall be posted at the time of the application to guarantee the cost of removal. The amount of the bond or cash deposit shall be set by separate ordinance.

(3) *Sign identification.* Each sign location shall be listed on the permit. The date of the permit expiration shall appear on each sign.

(4) *Building Commissioner approval.* The following signs may be approved by the Building Commissioner, do not require a deposit and are not subject to the time limitations of paragraph (f)(1) hereof:

A. Municipal of governmental signs;

B. Special event signs;

C. Temporary development signs; and

D. Temporary identification signs. Upon application for a permanent identification sign, permission for a temporary identification sign, similar in size and type to the permanent sign being applied for, may be granted by the Building Commissioner until approval of the permanent sign is made, for a period not to exceed 120 days, provided that the applicant may be permitted to maintain a temporary identification sign for a longer period of time upon specific application to the Council for permission to do so and approval thereof by motion, which motion shall set forth with specificity any additional time granted to the applicant. . . .

The exceptions noted at C.O.B.H. § 1479.18 are the general exceptions to all the restrictions of the sign ordinance:

(a) Cornerstones and permanent building plaques, displaying the date of construction, the building name, or similar information;

(b) Display of official public notices, the flag and an emblem or insignia of an official government body;

(c) Holiday decorations for customary periods of time;

(d) Signage which is not advertising and which is an integral part of the original construction of vending machines, fuel pumps or similar devices;

(e) Street name signs; and

(f) Special signage determined by the Architectural Review Board to be reasonable considering the intent and regulations of this chapter.

C.O.B.H. § 1479.18.

Anyone denied a permit by the Building Commissioner may appeal the decision within ten days to the Architectural Board of Review ("the Board"):

An order may be reversed or modified by the Board if it finds:

(1) The order is contrary to a provision of this Code.

(2) The order is contrary to a fair interpretation or application of this Code.

(3) A variance from the provisions of this Code, in a specific case, will not be contrary to the public interest where literal enforcement of this Code will result in unnecessary hardship.

C.O.B.H. § 1440.25(a). The Board must schedule a hearing within 30 days of receiving an appeal and must render a decision within 30 days after holding a hearing. C.O.B.H. § 1440.25(b) & (c). Any party not satisfied with the decision of the Board may appeal to the Court of Common Pleas of Cuyahoga County. C.O.B.H. § 1440.25(f).

*3. Broadview Heights' sign ordinance as a system of prior restraint*

██ Broadview Heights' sign ordinance considers content in determining whether to grant a permit to erect a sign. The ordinance mandates that "Council shall not approve a sign that does not conform to these regulations and shall not reject a sign that does conform to these regulations." C.O.B.H. § 1479.13(e). Because pervasive content-based distinctions in the ordinance determine whether, when, where, and how a sign may be displayed, permits will necessarily be approved or denied in part on the basis of content. Thus, Broadview Heights' sign ordinance is valid only if it contains all three procedural safeguards potentially applicable to permit schemes.[21] Broadview Heights' permit scheme would be invalid even if it were content-neutral, however, because it does not contain any of the procedural safeguards potentially applicable to permit schemes.

The sign ordinance does not preserve the status quo for a specified brief period until judicial review is obtained. The ordinance provides:

> Whenever the removal ... of any permanent sign has been ordered by the Building Commissioner, the person, firm or corporation who or which erected such sign or on whose premises such sign or display structure has been erected, affixed or attached shall remove or maintain the sign within two business

days[22] after receiving such notice. In the event of noncompliance, the Commissioner may remove or cause to be removed or maintained such sign at the expense of the person, firm or corporation who or which erected such sign, or on whose premises it was erected, affixed or attached; each person, firm or corporation shall be individually and separately liable for the expenses incurred in the removal of such sign.

C.O.B.H. § 1479.14(b). There is no provision in the ordinance for preserving the status quo pending judicial resolution of a dispute between a sign owner seeking a permit and the city.[23]

The ordinance does not guarantee a prompt judicial determination reviewing the denial of a permit. There is no time limit within which the Council must make a decision and the Building Commissioner must issue a permit. An applicant denied a permit must appeal that decision to the Board. C.O.B.H. § 1440.25(a). The Board's decision on appeal may issue as late as 60 days after the denial of a permit. *Id.* If the applicant is dissatisfied with the Board's decision, the applicant may then appeal to the Court of Common Pleas of Cuyahoga County. C.O.B.H. § 1440.25(f). There is no guarantee under Ohio law as to when the reviewing court will reach a determination in the matter. "While we trust state courts to exercise due diligence, we cannot be sure that a state judge, who often is elected and toiling under a busy

---

**21.** XXL also contends that the sign ordinance *is invalid because it vests unconstrained discretion to approve or deny a permit in the hands of government officials. The magistrate judge does not address this question because the sign ordinance so clearly lacks the procedural safeguards necessary to a valid permit scheme.

**22.** Temporary signs must be removed within 24 hours of the Commissioner's order. *See* C.O.B.H. § 1479.14(b).

**23.** The applicant need not be in possession of a prohibited sign because the applicant erected a sign without a proper permit. The applicant may be seeking a permit for a prohibited sign for other reasons. In the instant case, for example, a nonconforming sign changed ownership. *See* C.O.B.H. § 1479.15.

docket, will conduct a hearing and render a decision in a prompt manner." *Night-clubs,* 202 F.3d at 892.

The ordinance and the related provisions at C.O.B.H. § 1440.25 put the burden of going to court on the applicant, not on the censor. Moreover, if the applicant seeks a temporary or permanent injunction to prevent the city from enforcing the ordinance, the burden of proof is on the party seeking the injunction, and that party must prove the necessity for an injunction by clear and convincing evidence. *See, e.g., Procter & Gamble Co. v. Stoneham,* 140 Ohio App.3d 260, 267–68, 747 N.E.2d 268, 273 (2000); *Rein Constr. Co. v. Trumbull County Bd. of Comm'rs,* 138 Ohio App.3d 622, 630–31, 741 N.E.2d 979, 985–86 (2000).

In sum, Broadview Heights' sign ordinance lacks every procedural perquisite for a valid permit scheme. Even if the ordinance were a content-neutral regulation of speech, the permit scheme in the ordinance would be invalid.

Broadview Heights argues that the permit scheme is a valid, content-neutral use of its police powers aimed at the secondary effects of First Amendment activity rather than at the activity itself. This argument is unavailing, for two reasons.

First, as has already been shown, the permit scheme is *not* content-neutral. Broadview Heights contends that the ordinance is content-neutral despite the differential treatment accorded signs on the basis of content and despite the differential treatment accorded differing speakers because the ordinance does not justify its sign restrictions by reference to the content of the signs. But the only kind of restrictions on speech that are considered content-neutral for First Amendment purposes despite making content-based distinctions are restrictions affecting sexually-explicit speech. Sexually-explicit speech is accorded less protection than other kinds of speech because of a reduced societal interest in protecting such expression [24] The speech at issue in the instant case includes political and religious speech deserving the greatest protection afforded by the First Amendment.

Second, even if the permit scheme in Broadview Heights' sign ordinance could be considered a content-neutral use of its police powers aimed at the secondary effects of First Amendment activity rather than at the activity itself, the permit scheme would still be invalid. When a content-neutral ordinance aimed at the secondary effects of protected speech incidentally restricts that speech, the constitutional test of the restrictions employed in *O'Brien* is used. *See Pap's A.M.,* 529 U.S. at 294–302, 120 S.Ct. 1382. That test requires that the incidental restriction on protected speech be narrowly tailored so that the restriction is no greater than is essential to further the government's interest. *O'Brien,* 391 U.S. at 377, 88 S.Ct. 1673; *see also Turner Broad.,* 512 U.S. at 662, 114 S.Ct. 2445; *Ward,* 491 U.S. at 799, 109 S.Ct. 2746 (finding that the regulation must not "burden substantially more speech than is necessary to further the government's legitimate interests"). But the restrictions in the ordinance are not narrowly tailored to further Broadview Heights' legitimate interests in traffic safety, aesthetics, and maintaining property

---

**24.** Nor may Broadview Heights argue that the standard employed in *Ward* is appropriate here. The ordinance is not an otherwise content-neutral regulation which has merely incidental effects which burden speech. The burdens imposed on speech by the ordinance result from explicitly content-based restric- tions; they are not mere incidents to content-neutral restrictions. Thus, even though the ordinance's restrictions on speech are "justified without reference to the content of the regulated speech ...," *Ward,* 491 U.S. at 791, 109 S.Ct. 2746, the ordinance is not content-neutral.

values. Many of the restrictions in the ordinance have no obvious connection to these interests. *See supra,* pp. 790–92. Moreover, the ordinance effected by the permit scheme is substantially overbroad. *See supra* pp. 785–89. The ordinance severely limits the use of residential signs, effectively bars the use of signs to all political speech not connected with a political campaign, bars the use of signs to individuals wishing to express religious or other personal messages, and imposes burdens on non-commercial speech it does not impose on commercial speech. Such a regulation cannot pass any test which requires narrowly tailored legislation.

The permit scheme in Broadview Heights' sign ordinance lacks every procedural safeguard required of a valid permit scheme, is not a content-neutral use of Broadview Heights' police powers aimed at the secondary effects of First Amendment activity, and would fail the test of intermediate scrutiny even if the permit scheme were considered content-neutral. For these reasons the permit scheme in the ordinance is an impermissible prior restraint of speech.

*F. Severability*

XXL contends that the unconstitutional portions of Broadview Heights' sign ordinance are not severable from the constitutional portions of the ordinance. Defendants contend that these portions of the ordinance are severable.

*1. The standard for severability*

"Severability of a local ordinance is a question of state law. . . ." *Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 772, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988). Ohio Rev.Code § 1.50 provides that statutory provisions are presumptively severable:

> If any provisions of a section of the Revised Code or the application thereof to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of the section or related sections which can be given effect without the invalid provision or application, and to this end the provisions are severable.

A court may only sever a portion of a statute, however, if the severance "will not fundamentally disrupt the statutory scheme of which the unconstitutional provision is a part." *State ex rel. Maurer v. Sheward,* 71 Ohio St.3d 513, 523, 644 N.E.2d 369, 377 (1994). Ohio uses a three part test to determine whether a portion of a statutory scheme is severable:

> (1) Are the constitutional and the unconstitutional parts capable of separation so that each may be read and may stand by itself? (2) Is the unconstitutional part so connected with the general scope of the whole as to make it impossible to give effect to the apparent intention of the Legislature if the clause or part is stricken out? (3) Is the insertion of words or terms necessary in order to separate the constitutional part from the unconstitutional part, and to give effect to the former only?

*State v. Hochhausler,* 76 Ohio St.3d 455, 464–65, 668 N.E.2d 457, 466–67 (1996) (quoting *Geiger v. Geiger,* 117 Ohio St. 451, 466, 160 N.E. 28, 33 (1927)); *see also Women's Medical Prof'l Corp. v. Voinovich,* 130 F.3d 187, 202 (6th Cir.1997). A provision must pass all three parts of the test to be severable. *See Maurer,* 71 Ohio St.3d at 523, 644 N.E.2d at 377–78; *Geiger,* 117 Ohio St. at 466, 160 N.E. at 33.

Federal courts must take particular care not to infringe on state power by altering state law to preserve constitutionality. Federal courts may not "rewrite statutes to create constitutionality." *Eubanks,* 937

F.2d at 1122. The Sixth Circuit has emphasized, "A federal court must always be aware of the federalism concerns that arise whenever it deals with state statutes. 'The principles of federalism forbid a federal appellate court to arrogate the power to rewrite a municipal ordinance.'" *Triplett Grille,* 40 F.3d 129 at 136 (quoting *Eubanks,* 937 F.2d at 1125 (citation omitted)).

### 2. Severability and violations of the First Amendment in the ordinance

■ The unconstitutional portions of Broadview Heights' sign ordinance are not severable from the constitutional portions of the ordinance. In addition to the impermissible, particular content-based distinctions found throughout the ordinance, the unconstitutional classification according to use types at C.O.B.H. § 1479.03(a) underlies the ordinance as a whole. Without that system of classifications, most of the distinctions in the sign ordinance disappear, and the remaining ordinance cannot stand by itself as a coherent system. Such a change would fundamentally disrupt the current statutory scheme for regulating signs.

■ Nor is the permit scheme at C.O.B.H. § 1479.13 severable from the rest of the ordinance. With the exception of some temporary signs, all permanent and temporary signs require permits. If the scheme for granting permits is unconstitutional, a court cannot determine whether the council would prefer that all signs be allowed without a permit. Once the permit scheme is stricken, a court cannot give effect to the intention of the council in that contingency because the council's intention is not known.

■ Likewise, the ban on pole signs cannot be severed from the rest of the ordinance because it is only unconstitutional in conjunction with the list of exemptions from the regulations at C.O.B.H. § 1479.18. Once again, a court cannot know whether the council would prefer that the ban on pole signs be struck to preserve the exemptions or whether the exemptions should be struck to preserve the ban on pole signs. Absent a knowledge of legislative intention, a court cannot sever a portion of the ordinance to preserve that intention.

### G. Conclusions

The magistrate judge concludes that those portions of Broadview Heights' sign ordinance which violate the First Amendment are not severable from the portions which do not violate the First Amendment. For this reason the magistrate judge recommends that the court grant XXL's motion for summary judgment as to its claims that the sign ordinance makes impermissible content-based distinctions in regulating non-commercial speech, impermissibly restricts non-commercial speech, makes impermissible content-based distinctions in regulating commercial speech, impermissibly allows some speakers and not others to use pole signs, and is an impermissible prior restraint on speech. The magistrate judge also recommends that the court overrule defendants' motion for summary judgment as to these claims. Because those portions of the sign ordinance which violate the First Amendment are not severable from those portions of the ordinance which do not violate the First Amendment, the magistrate judge further recommends that the court overturn Broadview Heights' sign ordinance in its entirety.[25]

---

**25.** Although the entire ordinance should be overturned on First Amendment grounds, the magistrate judge will examine all federal issues pending in the motions before the court because this is a Report and Recommendation.

## VI. Vagueness claim

XXL claims that Broadview Heights' sign ordinance is void for vagueness because many of the ordinance's provisions are ambiguous and open to varying interpretations. Defendants reply that XXL is not entitled to challenge the ordinance as void for vagueness because "in cases not involving First Amendment freedoms, a person to whose conduct a statute clearly applies may not successfully challenge other portions of the statute on grounds of vagueness." Def. mot. at 13. Because defendants' characterization of the case as not involving First Amendment freedoms is mistaken, the court will examine the merits of XXL's claims that many of the provisions of Broadview Heights' sign ordinance are impermissibly vague.

### A. The standard for determining impermissible vagueness

■■■■■ An ordinance is void for vagueness if its terms are not reasonably clear. The vagueness doctrine has two goals: to ensure fair notice to citizens and to provide standards for law enforcement. *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983); *Belle Maer Harbor v. Charter Township of Harrison*, 170 F.3d 553, 556 (6th Cir.1999). The first goal requires that citizens understand what a law says. "A statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." *Columbia Natural Res., Inc. v. Tatum*, 58 F.3d 1101, 1105 (6th Cir.1995) (quoting *Connally v. General Const. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926)). The second goal requires precision to ensure fair enforcement. "A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).

Courts require greater precision when laws define criminal offenses or impinge on protected speech. *Hynes v. Mayor and Council of the Borough of Oradell*, 425 U.S. 610, 620, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976); *see also Marks v. United States*, 430 U.S. 188, 196, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) ("We have taken special care to insist on fair warning when a statute regulates expression and implicates First Amendment values."). "Uncertain meanings inevitably lead citizens to 'steer far wider of the unlawful zone' ... than if the boundaries of the forbidden areas were clearly marked" *Grayned*, 408 U.S. at 109, 92 S.Ct. 2294 (quoting *Baggett v. Bullitt*, 377 U.S. 360, 372, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964)). Thus, if an ordinance "interferes with the right of free speech ..., a more stringent vagueness test should apply." *Village of Hoffman Estates*, 455 U.S. at 499, 102 S.Ct. 1186. *See also Hynes*, 425 U.S. at 620, 96 S.Ct. 1755 ("The general test of vagueness applies with particular force in review of laws dealing with speech."); *Belle Maer Harbor*, 170 F.3d at 557 ("An enactment ... reaching a substantial amount of constitutionally protected conduct may withstand facial constitutional scrutiny only if it incorporates a high level of definiteness."). Vague laws which impinge on protected speech are especially dangerous because they fail to provide precise standards for enforcement:

> The absence of clear standards guiding the discretion of the public official vested with the authority to enforce the enactment invites abuse by enabling the official to administer the policy on the basis of impermissible factors.... We will not presume that the public official responsible for administering a legislative policy will act in good faith and

respect a speaker's First Amendment rights; rather, the vagueness "doctrine requires that the limits the [government] claims are implicit in its law be made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice." Thus, a statute or ordinance offends the First Amendment when it grants a public official "unbridled discretion" such that the official's decision to limit speech is not constrained by objective criteria, but may rest on "ambiguous and subjective reasons."

*United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Reg'l Transit Auth.,* 163 F.3d 341, 359 (1998) (citations omitted).

The vagueness doctrine does not require absolute precision from lawmakers, however. Ambiguity is inherent in language. "Condemned to the use of words, we can never expect mathematical certainty from our language." *Grayned,* 408 U.S. at 110, 92 S.Ct. 2294. Moreover, "[i]t will always be true that the fertile legal 'imagination can conjure up hypothetical cases in which the meaning of (disputed) terms will be in nice question.'" *Grayned,* 408 U.S. at 112 n. 15, 92 S.Ct. 2294 (quoting *American Communs. Assn. v. Douds,* 339 U.S. 382, 412, 70 S.Ct. 674, 94 L.Ed. 925 (1950)). Valid laws may be written with "flexibility and reasonable breadth, rather than meticulous specificity," *Esteban v. Central Missouri State College,* 415 F.2d 1077, 1088 (8th Cir.1969), if "a reasonable person ... would be able to interpret ... what is required and what conduct is prohibited." *Greenville Women's Clinic v. Commis-*

*sioner,* 317 F.3d 357, 366 (2002). *See also Grayned,* 408 U.S. at 108, 92 S.Ct. 2294; *Belle Maer Harbor,* 170 F.3d at 557.

*B. Vagueness in the sign ordinance*

■■ XXL cites 49 provisions in the sign ordinance which it alleges are impermissibly vague. *See* Pl. mot., Exh. 58. Most of the provisions of the sign ordinance to which XXL objects are not so vague that a reasonable person would not know what is required and what is prohibited.[26] Some provisions of the ordinance are not mandates or prohibitions and do not affect mandates or prohibitions in other portions of the ordinance. Any alleged vagueness in these provisions raises, therefore, no constitutional problems.[27] Some terms in the sign ordinance, however, are impermissibly vague.

The meaning of "public function" in the definition of a special event sign as a sign "which may be in the street right of way announcing a public function" is unacceptably vague. C.O.B.H. § 1479.03(a)(2)(D). Whether either a free promotional concert sponsored by a commercial business or a concert to which tickets are sold to the public is a "public function" cannot be determined from the statute. If a person cannot determine what a "public function" is, that person cannot determine whether the ordinance is offended by placing a sign announcing an event in the street right of way.

The meaning of "nearby location" in the definition of a temporary directional sign as a sign which is "[a] ground sign directing vehicular or pedestrian traffic to a

**26.** For example, the word "integral" is not overly vague in the prescription that a wall or panel sign is "integral with the face of an exterior building wall of a building...." C.O.B.H. § 1479.03(b)(6). Likewise, the terms "compatible" and "other existing signs" are not overly vague in the requirement that "the color of the signs shall be

compatible with the color of the building facade and other existing signs." C.O.B.H. § 1479.05(a).

**27.** For example, the stated objectives of the sign ordinance and the determinations in support of the ordinance mandate or prohibit nothing. *See* C.O.B.H. § 1479.01.

temporary activity taking place at another, but nearby, location, such as an open house sign for the sale of real estate" is unacceptably vague. A person cannot determine at what distance posting a sign announcing a garage sale offends the ordinance because the sign is no longer "nearby."

The meaning of "general area" in the specification that "if such sign is attached to a wall or other man-made base, including a graded earth mound, the sign height shall be measured from the grade of the general area" is unfathomable. C.O.B.H. § 1479.04(b). The incomprehensibility of this phrase prevents an individual from determining whether some signs offend the height limits of the ordinance.

The requirement that a sign "should be in harmony with the building(s) [sic] ... use" has no readily understood meaning. C.O.B.H. § 1479.05(a).

The meanings of "overly large," "out of scale with the building," and "excessive amount of information" in the following are impermissibly vague: "[L]ettering shall not be overly large or out of scale with the building. An excessive amount of information that could create a potential safety hazard shall not be permitted." C.O.B.H. § 1479.05(b). A person of average intelligence cannot know from this provision when the size of lettering or the amount of information on a sign offends the ordinance.

The precise meaning of the requirement that "[s]igns shall be fabricated on and of materials ... complimentary to their building" cannot be determined from the ordinance. C.O.B.H. § 1479.05(c).

The meaning of "uniform" is unclear in the warning to the owner of a building leased to multiple tenants that "[a]ll approvals for subsequent tenants' signs shall be uniform with the approvals for initial tenants' signs." C.O.B.H. § 1479.09. In what respects subsequent signs are ex-pected to be "uniform" with previous signs cannot be determined from the ordinance.

The meaning of "essential to directing and instructing" is unclear in the following provision:

Permanent information signs at fuel pumps and service islands are permitted. Such signs shall be limited to the display of information regarding the type of service provided and other information essential in directing and instructing the motoring public, as approved by the Planning Commission.

C.O.B.H. § 1479.09(d)(4)(D). What is "essential" direction and instruction and in what respects the motoring public may be directed and instructed by such signs without offending the ordinance is impermissibly vague.

The meaning of "community facility" is unclear. C.O.B.H. § 1479.11. An individual cannot determine from the ordinance what a community facility is or whether it may be privately owned. Consequently, whether a privately owned facility is permitted to post signs according to the provisions applicable to community facilities without offending the ordinance is not known.

The meaning of "community special event" in the admonition that "community special event signs shall not be displayed for period [sic] of greater than two weeks" is entirely unclear. C.O.B.H. § 1479.12(c)(5).

The requirement that information signs "[b]e located relative to similar signs otherwise permitted in that district" is without fathomable meaning. C.O.B.H. § 1479.12(d)(2).

The meaning of "similar signs of a personal nature" in the provision that a permit is not required to post "[g]arage sale signs or other similar signs of a personal nature in a residential district," C.O.B.H.

§ 1479.13(b)(3), is impermissibly unclear, as has already been discussed. *See supra,* p. 787 n. 13.

The following provision of the ordinance has two problems with impermissible vagueness:

> The Building Commissioner shall examine the application and verify conformance with the requirements of this chapter, as well as the location and relationship to signs currently existing.... The Board shall review the application and drawings for appropriateness of size, scale, shape, color, and illumination in relation to building size.

C.O.B.H. § 1479.13(d). First, what an individual must do to ensure that signs pass inspection when the Building Commissioner verifies "relationship to signs currently existing" cannot be determined from the ordinance. Second, what is appropriate "size, scale, shape, color, and illumination in relation to building size" is too vague for a person of reasonable intelligence to know what the provision mandates or prohibits.

The requirement at C.O.B.H. § 1479.15(a) suffers from an ambiguity created by the preceding section of the ordinance. Section 1479.14 requires that "[a]ll signs and sign structures shall be maintained in a safe and attractive condition." Section § 1479.15(a) warns that "[a]ny lawful nonconforming sign may be maintained and the structural or electrical parts repaired or restored to a safe condition only if required by law." It is unclear if the framers of the ordinance meant the requirement to maintain signs and sign structures at C.O.B.H. § 1479.14 as a legal requirement satisfying the phrase "required by law" in C.O.B.H. § 1479.15(a) or if the framers meant a legal requirement other than the requirements in the sign ordinance itself. The plain meaning of C.O.B.H. § 1479.15(a) allows an individual to maintain a nonconforming sign by virtue of the requirement at C.O.B.H. § 1479.14.

This plain meaning makes the provision at C.O.B.H. § 1479.15(a) contradictory, since an individual would *always* be allowed to maintain a nonconforming sign despite the restrictions in that subsection.

The meaning of "similar information" in the provision that "[c]ornerstones and permanent building plaques, displaying the date of construction, the building name or similar information" are exempt from the sign regulations is impermissibly vague. C.O.B.H. § 1479.18(a).

The meaning of "customary periods of time" in the provision that "[h]oliday decorations displayed for customary periods of time" are exempt from the sign regulations is impermissibly vague. It is impossible to determine, for example, which times for the display of Christmas decorations are customary when retailers routinely display Christmas decorations on Halloween. In general, a person of reasonable intelligence cannot determine precisely when any "customary" period begins and ends or whose customs count in making such a determination.

The meanings of "special signage" and "reasonable" in the provision that "[s]pecial signage determined by the Architectural Review Board to be reasonable considering the intent and regulations of this Chapter" are impermissibly vague. A person of reasonable intelligence cannot determine what signs are "special signage" and precisely when they are reasonable taking the ordinance as a whole.

Because a person of reasonable intelligence cannot know with adequate precision what the sign ordinance mandates or prohibits in the preceding provisions, those provisions should be found void for impermissible vagueness.

*C. Severability of impermissibly vague terms*

 The eighteen subsections of the ordinance which, when considered alone in

or combination with other subsections, contain words, phrases, or sentences which are void for vagueness may be severed from the rest of the ordinance. The following changes can accomplish this severance.

"Public function" at C.O.B.H. § 1479.03(a)(2)(D) should be stricken. This destroys the meaning of C.O.B.H. § 1479.03(a)(2)(D), requiring the severance of that entire subsection.

"Nearby location" at C.O.B.H. § 1479.03(a)(2)(F) may be severed without otherwise altering that subsection.

"General area" at C.O.B.H. § 1479.04(b) and the sentence containing it are incomprehensible. The second sentence of C.O.B.H. § 1479.04(b) should be stricken in its entirety.

"Use" in C.O.B.H. § 1479.05(a) should be severed, but this can be done without changing any other part of that subsection.

The following at C.O.B.H. § 1479.05(b) should be excised: "However, the lettering shall not be overly large or out of scale with the building. An excessive amount of information that could create a potential safety hazard shall not be permitted."

The words "and complimentary to their building" at C.O.B.H. § 1479.05(c) should be eliminated.

The sentence, "All approvals for subsequent tenants' signs shall be uniform with the approvals for initial tenants' signs," at C.O.B.H. § 1479.09 should be severed.

The paragraph at C.O.B.H. § 1479.09(d)(4)(D) should be altered by excising the underlined phrase:

Permanent information signs at fuel pumps and service islands are permitted. Such signs shall be limited to the display of information regarding the type of service provided and other information *essential in directing and instructing the motoring public,* as approved by the Planning Commission.

Most of C.O.B.H. § 1479.11 may be preserved by changing *"Schedule of Community Facilities Signs Permitted by Use and Structural Type"* at C.O.B.H. § 1479.11(a) to read *"Schedule of Signs Permitted by Use and Structural Type"* and by changing *"Schedule of Community Facilities Sign Regulations"* at C.O.B.H. § 1479.11(b) to read *"Schedule of Sign Regulations."* The name "Community Facilities District" need not be changed even though the meaning of "community facility" is unclear as the ambiguity would no longer affect any mandate in the ordinance.

The phrase "or community special event" should be stricken from C.O.B.H. § 1479.12(c)(5).

The requirement at C.O.B.H. § 1479.12(d)(2) should be severed in its entirety.

The ambiguous phrase "or other similar signs of a personal nature" at C.O.B.H. § 1479.13(b)(3) should be excised.

The paragraph at C.O.B.H. § 1479.13(d) should be altered by excising the underlined phrases:

The Building Commissioner shall examine the application and verify conformance with the requirements of this chapter, *as well as the location and relationship to signs currently existing....* The Board shall review the application and drawings for appropriateness of size, scale, shape, color, and illumination *in relation to building size.*

The subsections at C.O.B.H. §§ 1479.14 and 1479.15(a) may be saved by altering C.O.B.H. § 1479.15(a) to sever the following underlined phrases:

Any lawful nonconforming sign may be maintained and the structural or electrical parts repaired or restored to a safe condition *only if required by law.* Otherwise, a nonconforming sign shall not be altered or moved unless it is made to comply with this chapter. *If any sign*

*or part thereof is damaged, destroyed to more than fifty percent of its reproduction value or taken down, it shall not be rebuilt or relocated unless made to comply with the regulations of the district in which it is located.*

The phrase, "or similar information," should be severed from C.O.B.H. § 1479.18(a).

The phrase "displayed for customary periods of time" should be severed from C.O.B.H. § 1479.18(c).

The subsection at C.O.B.H. § 1479.18(f) should be stricken in its entirety.

### D. Conclusions

As regards XXL's claim that terms in the sign ordinance are void for vagueness, the magistrate judge recommends that the court grant XXL's motion for summary judgment in part and overrule it in part and grant defendants' motion in part and overrule it in part by finding terms in eighteen sections of the sign ordinance void for vagueness as described above. The magistrate judge also recommends that the court order that those portions of the sign ordinance be severed as void for vagueness from the other portions of the sign ordinance.

### VII. Equal protection claims

XXL alleges that Broadview Heights' sign ordinance violates the equal protection clause on its face and as applied in allowing speech to some parties which is not allowed to others. Specifically, XXL asserts that the ordinance allows only government and community facility speakers to use certain types of signs and the content associated with those signs and asserts that municipal officials have selec-

tively enforced Broadview Heights' sign ordinance. Defendants reply that no provision of the ordinance at issue in this case raises facial equal protection concerns.

### A. Alleged facial violation of the equal protection clause

 A statute challenged for allegedly violating the equal protection clause of the Fourteenth Amendment is subject to strict scrutiny when the statute has an impact on a constitutionally-protected "fundamental" right. *Clark v. Jeter*, 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988) ("[C]lassifications affecting fundamental rights are given the most exacting scrutiny."); *Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Michigan Gaming Control Bd.*, 172 F.3d 397, 410 (6th Cir.1999). Strict scrutiny is appropriate in this case because the sign ordinance affects a constitutionally-protected fundamental right, the right to freedom of speech. *Lac Vieux*, 172 F.3d at 410. Strict scrutiny requires the government "to show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Perry Education Ass'n. v. Perry Local Educators' Ass'n.*, 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). Under strict scrutiny a narrowly drawn restriction must be the least restrictive alternative available. *Ward*, 491 U.S. at 798 n. 6, 109 S.Ct. 2746 (citing *Boos*, 485 U.S. at 329, 108 S.Ct. 1157).

XXL contends that the sign ordinance permits government and community facility speakers to use certain types of signs and the content associated with those signs and denies that privilege to other speakers.[28]

28. In XXL's opposition to defendants' motion for summary judgment ("Pl. opp."; Docket # 78), XXL also asserts that the ordinance's provisions regarding informational signs facially violate the equal protection clause.

Even if the court were to consider a claim raised so late in the brief, it would find that claim to be without merit. Section 1479.03(a)(1)(E) described information signs as signs which present "miscellaneous infor-

■ Official public notices and the emblems and insignia of government bodies are exempt from the restrictions in the sign ordinance. C.O.B.H. § 1479.18(b). XXL argues that this permits only government speakers to use certain types of signs and certain content. While this is one possible interpretation of the ordinance, another reasonable interpretation is that any speaker is entitled to display public notices and the insignia of government bodies unconstrained by the restrictions in the ordinance.[29] As already noted, the court is constrained to adopt any reasonable interpretation of the ordinance which avoids unconstitutionality. The magistrate judge recommends, therefore, that the court interpret C.O.B.H. § 1479.18(b) to mean that all speakers may display public notices and the insignia of government bodies unconstrained by the restrictions in the ordinance. Having adopted that interpretation, the court should overrule XXL's motion for summary judgment as regards its allegation of a facial violation of the equal protection clause because the sign ordinance privileges government speakers. The court should also grant defendants' motion for summary judgment as to that claim.

■ XXL's contention that the sign ordinance also accords community facility speakers favored treatment is not as easily dismissed. The section of the ordinance describing the signs permitted in community facilities districts is not a model of clarity. Provisions in the section are ambiguous regarding whether all speakers in the district[30] or only community facilities may use the three types of signs permitted in the district: identification signs, bulletin boards, and directional signs. Either resolution of this ambiguity is problematic.

A bulletin board is "[a]n announcement sign which directs attention to and is located on the lot which is the subject of said sign." C.O.B.H. § 1479.03(a)(1)(B). Bulletin boards and the particular content associated with them are allowed only in community facilities districts and, perhaps, only to community facilities within those districts. See C.O.B.H. § 1479.11. But whether any speaker in a community facilities district may use a bulletin board or whether only a community facility may use a bulletin board, the ordinance allows only a select group of speakers to erect a sign displaying certain content, i.e. announcements.

Defendants have not advanced a compelling state interest served by the privilege granted favored speakers by C.O.B.H. § 1479.03(a)(1)(B) of its sign ordinance, nor have they shown that their unequal treatment of speakers is the least restrictive alternative available for serving that interest. Thus, C.O.B.H. § 1479.03(a)(1)(B) facially violates the equal protection clause of the Fourteenth Amendment. The magistrate judge recommends, therefore, that the court grant XXL's motion for summary judgment as to its claim that Broadview Heights' sign ordinance facially violates the equal protection clause by permitting only some speakers to use bulletin boards and their associated content. The magistrate judge

mation intended to serve the public." That section also provides, "An informational sign may be permitted in any district upon approval by the Planning Commission." There is nothing on the face of the statute which implicates equal protection concerns.

29. In such an interpretation, the word "official" in the phrase "official public notices"

describes the nature of the notices rather than the speaker displaying the notice.

30. The ordinance is unclear as to whether only community facilities are to be found in community facilities districts or whether other buildings and uses are also allowed in such districts.

also recommends that the court overrule defendant's motion as to that claim.

### B. Alleged violation of the equal protection clause as applied

XXL claims that Broadview Heights' selective enforcement of the sign ordinance violates the equal protection clause of the Fourteenth Amendment. XXL alleges that the city permits other parties to display, maintain, and change nonconforming signs and has singled out XXL for disparate treatment. According to XXL, Broadview Heights has issued 26 citations in the past three years for having, maintaining, or changing a nonconforming sign, and all but one of these citations was issued to XXL. Defendants do not deny the facts as XXL alleges them. Rather, defendants insist that XXL has not alleged sufficient facts to state a claim for a violation of the equal protection clause.

■■■■ "In our criminal justice system, the Government retains broad discretion as to whom to prosecute." *Wayte v. United States,* 470 U.S. 598, 607, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985). Nevertheless, selective enforcement of otherwise valid laws may violate constitutional rights protected by the equal protection clause of the Fourteenth Amendment. The government may not deliberately base the decision to prosecute "upon an unjustifiable standard such as 'race, religion or other arbitrary classification.'" *Gardenhire v. Schubert,* 205 F.3d 303, 319 (6th Cir.2000) (quoting *Wayte,* 470 U.S. at 608, 105 S.Ct. 1524). The Sixth Circuit uses a three-part test to determine whether the government has engaged in selective enforcement in violation of the equal protection clause:

> First, [an official] must single out a person belonging to an identifiable group, such as those of a particular race or religion, or a group exercising constitutional rights, for prosecution even though he has decided not to prosecute

persons not belonging to that group in similar situations. Second, [the official] must initiate the prosecution with a discriminatory purpose. Finally, the prosecution must have a discriminatory effect on the group which the defendant belongs to.

*United States v. Anderson,* 923 F.2d 450, 453 (6th Cir.1991). The group or class to which the plaintiff belongs may be a "class of one." *Village of Willowbrook v. Olech,* 528 U.S. 562, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000). "[T]here is a strong presumption that the state actors have properly discharged their official duties, and to overcome that presumption the plaintiff must present clear evidence to the contrary; the standard is a demanding one." *Stemler v. City of Florence,* 126 F.3d 856, 873 (6th Cir.1997) (citations omitted).

■■■■ XXL does not allege that Broadview Heights initiated its prosecution of XXL with a discriminatory purpose. Absent such an allegation, XXL cannot establish a claim that the sign ordinance as applied to XXL violates XXL's right to due process. The magistrate judge recommends, therefore, that the court overrule XXL's motion for summary judgment as to its claim of a violation of due process as the sign code was applied to XXL and grant defendants' motion as to the same claim.

### C. Severance

Severance of the preference accorded those speakers who are permitted to use bulletin boards and display the content associated with them is possible without inserting terms into the ordinance only by removing bulletin boards entirely from the ordinance. This requires the following changes in the ordinance.

The subsection at C.O.B.H. § 1479.03(a)(1)(B) should be deleted.

The subsection at C.O.B.H. § 1479.11(a)(2) should be deleted.

The references to bulletin boards, to the structural types associated with them, and to their maximum number, face area, maximum height, and setback should be excised.

The subsection at C.O.B.H. § 1479.11(c)(1) should be deleted.

The magistrate judge recommends that the court adopt the above changes in the sign ordinance to permit severance of those provisions of the ordinance which are unconstitutional for violations of equal protection from the rest of the ordinance.

## D. Conclusions

As regards XXL's claim that the sign ordinance facially violates the equal protection clause, the magistrate judge recommends that the court grant XXL's motion for summary judgment in part by finding impermissible the provision of the ordinance which allows only some speakers to use bulletin boards and display the content associated with bulletin boards. The magistrate judge also recommends that the court otherwise overrule XXL's claim that the sign ordinance facially violates the equal protection clause. The magistrate judge further recommends that the court overrule defendants' motion for summary judgment as to XXL's facial equal protection claims as they related to bulletin boards and otherwise grant defendants

motion as to XXL's facial equal protection claims.

As regards XXL's claim that Broadview Heights' application of the sign ordinance violates the equal protection clause, the magistrate judge recommends that the court overrule XXL's motion for summary judgment and grant defendants' motion.

Finally, the magistrate judge recommends that the court order severed those portions of the sign ordinance which are not permitted under the equal protection clause from those portions which are permitted.

## VIII. Due process claim [31]

XXL alleges that Broadview Heights' sign ordinance violates the guarantee of procedural due process in the Fourteenth Amendment because it allows the seizure of signs without a hearing. Defendants reply that any claimed violation of procedural due process is not ripe because XXL failed to exercise its right of appeal from the decisions of the Building Commissioner.[32]

## A. Standing and ripeness

"Standing is 'the threshold question in every federal case.'" *Coyne v. American Tobacco Co.*, 183 F.3d 488, 494 (6th Cir. 1999) (quoting *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). The "irreducible" constitutional requirements of standing are:

**31.** XXL originally alleged that arbitrary and irrational distinctions in the sign ordinance violate substantive due process. Defendants argued that an action based on a violation of substantive due process is not available to XXL because XXL's action asserting violations of the First Amendment subsumes an action based on a violation of substantive due process. XXL concedes that defendants' argument is correct and withdraws its action based on an alleged violation of substantive due process.

**32.** Defendants initially alleged that XXL's claimed violation of procedural due process was not ripe because XXL "does not claim, nor can it claim that any of its signs have been seized or removed in this case." Def. mot. at 16. Since that time defendants caused the removal of one of the signs in dispute in this case. Having removed one of the signs despite a court order prohibiting that removal, defendants can no longer argue that XXL's due process claim is not ripe because XXL has suffered no injury in fact.

(1) that the plaintiff have suffered an "injury in fact"– an invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that there be a causal connection between the injury and the conduct complained of—the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) that it be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Bennett v. Spear*, 520 U.S. 154, 167, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). "A plaintiff bears the burden of demonstrating standing and must plead its components with specificity." *Coyne*, 183 F.3d at 494 (citing *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982)).

 XXL alleges that it was injured by defendants' failure to provide XXL procedural due process. XXL also asserts, *inter alia*, a takings claim against Broadview Heights. When a claim alleges a violation of procedural due process and that claim is advanced in conjunction with a takings claim, then the claimed violation of due process is not ripe, *i.e.* does not allege an "injury in fact," unless there has been both a taking and a failure of due process of law. *Bigelow v. Michigan Dept. of Nat. Res.*, 970 F.2d 154, 159–60 (6th Cir.1992). The deprivation of property by state action alleged in a procedural due process claim is not itself unconstitutional. "[W]hat is unconstitutional is the deprivation of such an interest without due process of law." *Christophel v. Kukulinsky*, 61 F.3d 479, 485 (6th Cir.1995) (quoting *Zinermon v. Burch*, 494 U.S. 113, 125, 110 S.Ct. 975,

108 L.Ed.2d 100 (1990)). Regardless of when the deprivation occurs, the constitutional violation "is not complete *unless and until the State fails to provide due process.*" *Christophel*, 61 F.3d at 485 (quoting *Zinermon*, 494 U.S. at 126, 110 S.Ct. 975) (emphasis added by the appellate court). In the Sixth Circuit there are two methods whereby a plaintiff may establish a procedural due process claim brought pursuant to § 1983: "(1) [by] demonstrating that he is deprived of property as a result of established state procedure that itself violates due process rights; or (2) by proving that the defendants deprived him of property pursuant to a 'random and unauthorized act' *and* that available state remedies would not adequately compensate for the loss." *Macene v. MJW, Inc.*, 951 F.2d 700, 706 (6th Cir.1991) (emphasis in the original) (quoting *Collins v. Nagle*, 892 F.2d 489, 497 (6th Cir.1989)).

### B. Process in the sign ordinance

Persons wishing to erect a permanent sign in Broadview Heights initiate process by applying to the Building Commissioner for a permit to erect the sign. *See* C.O.B.H. § 1479.13. Anyone denied a permit may appeal that decision to the Board:

> [A]ny person affected by a decision of the Building Commissioner or a notice or order issued under this ... Code shall have the right to appeal to the [Board] (Chapter 280), provided that a written application for appeal is filed within ten days after the decision, notice or order was served. An order may be reversed or modified by the Board if it finds:
>
> (1) The order is contrary to a provision of this Code.
>
> (2) The order is contrary to a fair interpretation or application of this Code.
>
> (3) A variance from the provisions of this Code, in a specific case, will not

be contrary to the public interest where literal enforcement of this Code will result in unnecessary hardship.

C.O.B.H. § 1440.25(a). Within 60 days the Board must hold a hearing and issue a decision. C.O.B.H. § 1440.25(b) & (c). A party dissatisfied with the decision of the Board may appeal to the Court of Common Pleas of Cuyahoga County. C.O.B.H. § 1440.25(f).

There is nothing in the sign ordinance which would require the city to preserve the status quo pending a decision of the Board or an appeal to the courts. The ordinance does not constrain the Building Commissioner in deciding when to order the removal of a nonconforming sign except insofar as it allows certain nonconforming signs which were in existence and nonconforming as of November 5, 1990. *See* C.O.B.H. § 1479.15. The ordinance also provides:

> Whenever the removal ... of any permanent sign has been ordered by the Building Commissioner, the person, firm or corporation who or which erected such sign or on whose premises such sign or display structure has been erected, affixed or attached shall remove or maintain the sign within two business days after receiving such notice. In the event of noncompliance, the Commissioner may remove or cause to be removed or maintained such sign at the expense of the person, firm or corporation who or which erected such sign, or on whose premises it was erected, affixed or attached; each person, firm or corporation shall be individually and separately liable for the expenses incurred in the removal of such sign.

C.O.B.H. § 1479.14(b). Nothing stands in the way of the Commissioner's removal of a nonconforming sign once the property owner has failed to remove that sign upon the Commissioner's order to do so.[33]

## C. Removal of XXL's pole sign and procedural due process

Broadview Heights caused the removal of one of XXL's pole signs during the pendency of this litigation. Whether this removal accorded with the procedures established by city ordinances or was a "random and unauthorized act" as the city contends, the removal violated XXL's rights to due process.

■■■ If the removal of XXL's pole sign accorded with procedures established by city ordinances, the removal violated XXL's right to procedural due process because it took XXL's property without a predeprivation hearing. Generally, "the Constitution requires some kind of a hearing before the State deprives a person of liberty or property." *Zinermon*, 494 U.S. at 127, 110 S.Ct. 975. *See also Goss v. Lopez*, 419 U.S. 565, 579, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (holding that due process requires at minimum notice and a hearing before deprivation of property). Postdeprivation process is sufficient only where it is necessary that the state act quickly or predeprivation process is impractical. *Zinermon*, 494 U.S. at 128–30, 110 S.Ct. 975. Broadview Heights does not argue in this case either a necessity to act quickly or the impracticability of predeprivation procedures. Consequently, if the removal of XXL's pole sign accorded with Broadview Heights procedures, then those procedures violate procedural due process.

■■■ If the removal of XXL's pole sign resulted from a random and unauthorized act, then the removal violated XXL's right to procedural due process because the

---

**33.** Indeed, it was partly for this reason that it was necessary for the court to issue an order requiring Broadview Heights not to remove the signs in dispute.

available state remedies are not adequate to compensate XXL for its losses. XXL has been deprived of the opportunity to advertise fully its services for some period of time and has been deprived of the monetary value of its sign. There is no sure procedure in the Broadview Heights sign code or in the statutes of the state of Ohio which would provide XXL reimbursement for its economic losses. The proper process for XXL to pursue to receive compensation for its loss is to petition for a writ of mandamus, a remedy which the Ohio Supreme Court calls "extraordinary relief." *State ex rel. Elsass v. Shelby County Bd. of Comm'rs,* 92 Ohio St.3d 529, 534–35, 751 N.E.2d 1032, 1037 (2001); *see discussion at Tri–Corp Mgmt. Co. v. Praznik,* 33 Fed.Appx. 742, 749–50 (6th Cir.2002). Moreover, there is no state procedure of any sort to provide compensation to XXL for the temporary deprivation of rights protected by the First Amendment. Because the available state remedies are not adequate to compensate XXL for its losses, the removal of XXL's pole sign as the result of a random and unauthorized act violated XXL's right to procedural due process.

For the above reasons the magistrate judge recommends that the court grant XXL's motion for summary judgment as regards its claim that defendants violated XXL's rights to procedural due process and overrule defendants' motion for summary judgment as to that claim.

## IX. Retroactive zoning

XXL claims that the sign ordinance violates Ohio's prohibition against retroactive zoning ordinances at Ohio Rev.Code § 713.15 and moves for summary judgment on this claim. Defendants oppose XXL's claim.

Because the sign ordinance is invalid *en toto* under federal law, as will be shown below, the magistrate judge recommends that the court decline to resolve issues of state law which would be made moot by the court's decision.

## X. Individual liability for municipal officials

XXL contends that the municipal officials named as defendants in this action [34] are individually liable to XXL for damages XXL has suffered because of enforcement of the unconstitutional provisions in Broadview Heights' sign ordinance. Defendants reply that XXL has not sufficiently pleaded its claim of individual liability and, in the alternative, reply that even if XXL has sufficiently pleaded its claim of individual liability, the named individuals are protected by qualified immunity.

### A. Pleading individual liability for municipal officials

The Sixth Circuit held in *Wells v. Brown,* 891 F.2d 591, 592 (6th Cir.1989), that plaintiffs seeking damages pursuant to § 1983 and naming state officials as defendants must set forth clearly in their pleadings that the named state officials were sued in their individual capacities. If the pleadings were not clear that the named officials were sued in their individual capacities, then the court would assume

---

**34.** The complaint and the other pleadings do not specify what official position was held by any of the named defendants. XXL argues for liability for the mayor and members of the city council, but it is not clear from plaintiff's pleadings if the set of named individual defendants is co-terminus with those officials. Defendants apparently concede that this is the case, however, in their own motion: "Plaintiff

has named as Defendants Mayor Leo Bender and nine members of the Broadview Heights City Council." Def. mot. at 18. As there are ten individuals named in the complaint, the magistrate judge concludes that, indeed, the set of named individual defendants is co-terminus with the mayor and city council of Broadview Heights.

that they were sued in their official capacities. *Id.* at 593–94.

The court gave two reasons for the rule stated in *Wells.* First, the court was concerned that the named officials receive proper notice of the possibility that they might be held individually liable to plaintiff. *Id.* at 594. Second,

> *Wells* found that § 1983 claimants must plead capacity for jurisdictional reasons. *Will [v. Michigan Dept. of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) ] determined that the Eleventh Amendment creates a jurisdictional bar to suits against states and state employees sued in their official capacities for money damages; Rule 9(a) states in relevant part that "[i]t is not necessary to aver the capacity of a party ... except to the extent required to show the jurisdiction of the court." Fed. R. Civ. Pro. 9(a). Accordingly, *Wells* reasoned, "[b]ecause the Eleventh Amendment places a jurisdictional limit on federal courts in civil rights cases against states and state employees, we understand Rule 9(a) to require plaintiffs to properly allege capacity in their complaint."

*Moore v. City of Harriman,* 272 F.3d 769, 771–72 (6th Cir.2001) (quoting *Wells,* 891 F.2d at 593).[35]

 The Sixth Circuit has recently held, however, that *Wells* does not "establish a per se rule requiring § 1983 plaintiffs to affirmatively plead "individual capacity" in the complaint...." *Moore,* 272 F.3d at 772. *Moore* makes clear that the proper test for determining whether a plaintiff has sufficiently pleaded a claim that named officials are sued in their individual capacities is the "course of proceedings" test. *Id.* That test provides that "while it is clearly preferable that plaintiffs explicitly state whether a defendant is sued in his or her 'individual capacity,' failure to do so is not fatal if the course of proceedings otherwise indicates that the defendant received sufficient notice." *Id.* (citation and footnote omitted). Courts applying this test should consider a number of factors in determining whether the course of proceedings indicates that the named officials have been sued in their individual capacities:

> The "course of proceedings" test considers such factors as the nature of the plaintiff's claims, requests for compensatory or punitive damages, and the nature of any defenses raised in response to the complaint, particularly claims of qualified immunity, to determine whether the defendant had actual knowledge of the potential for individual liability. The test also considers whether subsequent pleadings put the defendant on notice of the capacity in which he or she is sued. We are [also] mindful of the timing of subsequent filings ... to determine whether the parties are still in the early stages of litigation.

*Id.* at 772 n. 1.

Two cases illustrate the application of the "course of proceedings" test. In *Pelfrey v. Chambers,* 43 F.3d 1034 (6th Cir. 1995), plaintiff filed a complaint which did not indicate whether prison officials were being sued in their individual or official capacities. One month after the complaint was filed, plaintiff filed a motion to bar the Ohio Attorney General from representing the defendants and asserted that the de-

---

**35.** The jurisdictional issue which concerned the court in *Wells* is not applicable in this case, as the officials named here as defendants are municipal officials. Municipalities are not protected from suit by the 11th Amendment. *See Monell v. Dept. of Social Services of New York City,* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Thus, suits against municipal officials in their official capacities raise no jurisdictional concerns.

fendants were acting outside the scope of their employment when they engaged in the acts which formed the basis of the complaint. *Id.* at 1036. The Sixth Circuit found this to be sufficient notice that defendants were being sued in their individual capacities.

In *Abdur–Rahman v. Michigan Dept. of Corr.*, 65 F.3d 489 (6th Cir.1995), plaintiff again did not state in his complaint the capacity in which a state official was being sued. Plaintiff first made it clear that the defendant official was sued in both his individual and official capacities in plaintiff's opposition to defendant's motion for summary judgment. *Id.* at 491. The Sixth Circuit found that this was sufficient notice that defendant was being sued in his individual capacity.

### B. Whether XXL has sufficiently pleaded individual responsibility

XXL did not state in its complaint whether the named municipal officials were being sued in their individual or official capacities. The caption of the complaint listed the named individual defendants only by name and address; the caption did not list the defendants' official titles. *See Moore*, 272 F.3d at 773 (finding that defendant officials had notice that they were being sued in their individual capacities in part because the caption listed defendants without providing their official titles). XXL also asserted in its complaint that "the Mayor and individual members of City Council are jointly and severely [sic] liable under all Counts" because they were aware that under controlling precedent the sign ordinance was unconstitutional. Complaint (Docket # 1), p. 12. This assertion was repeated in XXL's amended complaint. *See* Plaintiff's First Amended Complaint (Docket # 25), pp. 12–13. XXL stated explicitly in its motion for summary judgment that the named individual defendants were being sued in

their individual capacities. Pl. mot. at 39–40.

Moreover, defendants were aware when they filed their answer that XXL might have been asserting individual liability against the individual defendants. Defendants' answer raised the defense of qualified good faith immunity, a defense only appropriate in a suit brought against an official in an individual capacity. See, e.g., *Pray v. City of Sandusky*, 49 F.3d 1154 (6th Cir.1995); *Knight v. Gill*, 999 F.2d 1020 (6th Cir.1993); *Johnson v. Estate of Laccheo*, 935 F.2d 109 (6th Cir.1991). The defense is unnecessary in a suit brought against a defendant in an official capacity because suing a public official in an official capacity for acts is equivalent to suing the government entity. *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). If defendants were not aware of the possibility that they were being sued in their individual capacity, they would not have raised the defense of good faith immunity in their answer.

For these reasons and viewing the course of the proceedings as a whole, the magistrate judge recommends that the court find that XXL has sufficiently pleaded a suit against the named individual defendants in their individual capacities to have put them on notice of the capacity in which they were sued.

### C. Liability for individual defendants

XXL asserts that the individual defendants are liable for damages suffered by XXL because even though a reasonable person in the individual defendants' position should have known that the sign ordinance was unconstitutional, the defendants failed to correct the ordinance's deficiencies and damaged XXL by enforcing the unconstitutional ordinance. Defendants raise the defense of qualified immunity against XXL's claims.

*1. The standard for qualified immunity*

Government officials acting within the scope of their authority are generally immune to civil suit:

> Government officials who perform discretionary functions are generally entitled to qualified immunity and are protected from civil damages so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." In other words, qualified immunity is appropriate either on the basis that the right allegedly violated was not at the time "clearly established," or if "clearly established," was one that a "reasonable" person in the defendant's position could have failed to appreciate would be violated by his conduct. The standard is one of objective reasonableness, analyzing claims of immunity on a fact-specific, case-by-case basis to determine whether a reasonable official in the defendants' position could have believed that his conduct was lawful, in light of clearly established law and the information he possessed. Thus, officials are "entitled to qualified immunity [when] their decision was *reasonable,* even if mistaken." Moreover, "[if] officers of reasonable competence could disagree on this issue, immunity should be recognized."

*Pray,* 49 F.3d at 1157–58 (6th Cir.1995) (citations omitted).

 A plaintiff faced with a defense of qualified immunity can overcome that defense only by showing that at the time of the alleged violation of plaintiff's rights the right in question was so clearly established that a reasonable official would have un-

derstood that the alleged conduct violated that right. *Anderson v. Creighton,* 483 U.S. 635, 639–40, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The Sixth Circuit has cautioned,

> The right must be defined at the appropriate level of specificity to determine whether it was clearly established at the time the defendants acted. This means that to be "clearly established" the contours of the right must be sufficiently clear so that a reasonable official would understand that what he is doing violates that right. A right is clearly established if there is binding precedent from the Supreme Court, the Sixth Circuit, the district court itself, or other circuits that is directly on point. " 'This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of preexisting law the unlawfulness must be apparent.' "

*Risbridger v. Connelly,* 275 F.3d 565, 569 (6th Cir.2002) (citations omitted) (quoting *Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)); *see also Cope v. Heltsley,* 128 F.3d 452, 458–59 (6th Cir.1997). "The standard is one of objective reasonableness, analyzing claims of immunity on a fact-specific, case-by-case basis to determine whether a reasonable official in the defendants' position could have believed that his conduct was lawful, in light of clearly established law and the information he possessed." *Pray,* 49 F.3d at 1158. "In the ordinary instance, to find a clearly established constitutional right, a district court must find binding precedent by the Supreme Court, its court of appeals or itself." *Ohio Civil Serv. Employees Ass'n v. Seiter,* 858 F.2d 1171, 1177 (6th Cir.1988).[36]

---

**36.** Defendants cite *Walton v. City of Southfield,* 995 F.2d 1331 (6th Cir.1993), for the proposition that a district court's own precedent is the source of law clearly establishing a constitutional right only in extraordinary

cases. Defendants misread the court's opinion in that case. In *Walton,* the Sixth Circuit said:

### 2. Qualified immunity and the individual defendants

In the instant case, qualified immunity cannot protect the mayor and city council members of Broadview Heights from liability. On January 21, 2000 the Federal District Court for the Northern District of Ohio issued its decision in *North Olmsted.* XXL offers evidence to support, and defendants do not deny, that attorneys for Broadview Heights drew defendants' attention to the decision in *North Olmsted* and warned that the decision indicated that Broadview Heights' sign code was problematic. The city began issuing citations to XXL for violations of the sign ordinance on August 20, 2000. Any reasonable official in the position of the mayor and city council members of Broadview Heights would have known in light of *North Olmsted* that enforcement of Broadview Heights' sign ordinance against XXL violated XXL's clearly established rights under the First Amendment.

The sign ordinance stricken in *North Olmsted* was remarkably similar to Broadview Heights' sign ordinance. First, the ordinance at issue in *North Olmsted* was based on a classification by use types

In inquiring whether a constitutional right is clearly established, we must "look first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits." *Daugherty v. Campbell,* 935 F.2d 780, 784 (6th Cir.1991), *cert. denied,* 502 U.S. 1060, 112 S.Ct. 939, 117 L.Ed.2d 110 (1992).

[I]n the ordinary instance, to find a clearly established constitutional right, a district court must find binding precedent by the Supreme Court, its court of appeals or itself. In an extraordinary case, it may be possible for the decisions of other courts to clearly establish a principle of law. For the decisions of other courts to provide such "clearly established law," these decisions must both point unmistakably to the unconstitutionality of the conduct complained of and be so clearly

which in many respects is identical to the classification by use types in the Broadview Heights ordinance. The North Olmsted ordinance read in part:

(a) *Classification by Use Types*

(1) "Permanent sign" means a sign designed for use for an indefinite period of time and shall include the following:

A. "Bulletin board" means an announcement sign which directs attention to and is located on the lot of a public or semi-public institution.

B. "Directional sign" means a sign indicating only the direction of pedestrian and vehicular circulation routes on the lot on which the sign is located. No advertising shall be permitted on directional signs.

C. "Identification sign" means a sign indicating the name and address of a building, development, public or semi-public facility, business, office or industrial establishment. For business uses, such sign may also include the principal type of goods sold or services rendered;

foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct, if challenged on constitutional grounds, would be found wanting.

*Ohio Civil Serv. Employees Ass'n,* 858 F.2d at 1177. Thus, it is only in extraordinary cases that we can look beyond Supreme Court and Sixth Circuit precedent to find "clearly established law."

*Id.* at 1336. The court is clear that in the usual course a district court may look to itself and other district courts within the circuit as a source of precedent. The phrase "Sixth Circuit precedent" in the Sixth Circuit Court's assertion that "it is only in extraordinary cases that we can look beyond ... Sixth Circuit precedent to find 'clearly established law'" means "precedent *within* the Sixth Circuit," not "precedent *from* the Sixth Circuit Court of Appeals."

however, the listing of numerous goods or services, prices, sale items, and telephone numbers shall not be permitted.

D. "Informational sign" means a sign which present [sic] miscellaneous information to the public rather than to promote a business, office, industry, product, or issue. (Typical information signs present scheduled events, travel information, vehicle service, weather, time, historic and scenic data.) Informational signs shall be allowed only for public and semi-public uses as an integral part of a permitted identification sign.

E. "Organizational sign" means a sign devoted exclusively to the identification of national, state and local service clubs. The number, location and design of organizational signs shall be approved by the Building Official.

F. "Nameplate" means a sign indicating the name, address or profession of the person or persons occupying a building, or unit of a building.

(2) "Temporary sign" means a sign designed for use for a limited period of time to announce special events or sales and the sale, lease or rental of property and shall include the following. The expiration date of a temporary sign as approved by the Building Official shall appear on each temporary sign.

A. "Project sign" means a sign which directs attention to the promotion, development and construction of the property on which it is located and which identifies the owner, architects, engineers, contractors and other individuals or firms involved with the construction.

B. "Real estate sign" means a sign advertising the sale, rental, or lease of the premises or part of the premises on which the sign is displayed.

*North Olmsted,* 86 F.Supp.2d at 765–66 (quoting City Ordinance of North Olmsted ("C.O.N.O.") § 1163.03(a)).

The regulations which employed this system of use types in North Olmsted's ordinance was, again, remarkably similar to the regulations in Broadview Heights ordinance. For example,

The content of a sign determines in whole or in part the maximum area allowable of that sign, where the sign must be located, the number of signs permitted, and whether the sign may be illuminated. . . . Any sign "visible from the sight lines along a street shall not contain an arrow or words such as 'stop', 'go', 'slow', etc.; and the movement, content, coloring or manner of illumination shall not resemble traffic control signs." . . . The color content of all signs must be compatible with the color of the building facade and other existing and proposed signs. All sign lettering must be "clearly legible and in scale with the sign surface upon which it is placed." . . . Only nameplates, identification signs, and bulletin boards may be illuminated for residential purposes. . . . Temporary displays or signs in connection with a charity drive or to advocate the election of a candidate or candidates or the passage or disapproval of an issue are exempt from the ordinance only if they are removed within 10 days of the completion of the drive or election involved. . . . "Informational signs" are not permitted for private use, but are permitted for "public or semi-public" use . . . Residential nameplates, identification signs, and bulletin boards may be illuminated, but signs indicating di-

rection, an organization, or a political message may not.

*North Olmsted,* 86 F.Supp.2d at 766–68 (citations omitted).

The *North Olmsted* court found the system of classification according to use types and the system of regulation which depended on it to be content-based. *Id.* at 765–67. The court also found that the system of classification and the system of regulation were together an impermissible regulation of non-commercial speech. The content-based ordinance failed the test of strict scrutiny:

> The City's sign ordinance contains a litany of content-based restrictions on protected noncommercial speech. Because the City has not shown that the content-based distinctions are necessary to serve their interests of safety and aesthetics, and because the ordinance is not narrowly drawn by the least restrictive means to achieve those interests, the City's content-based restrictions in its sign ordinance are unconstitutional.

*Id.* at 769.

As regards the regulation of commercial speech in North Olmsted's ordinance, the court found the *Central Hudson* test to be appropriate. But the court also found that the ordinance failed that test because its content-based restrictions on commercial speech did not advance the City's interests and were more extensive than necessary to serve those interests. *Id.* at 769–73. Many of the impermissible, content-based regulations of speech in North Olmsted's ordinance were strikingly similar to the regulations in Broadview Heights' ordinance:

> The content of a sign determines whether it is allowed to be erected in a business district.... Bulletin boards, organizational signs, and information signs are banned in business districts.... "Identification signs" may contain content indicating the name and address of a business, office, or industrial establishment. While such signs may, for "business purposes," include the "principal type of goods sold or services rendered," they may not include "the listing of numerous goods and services, prices, sale items, and telephone numbers[.]" *Id.* "Information signs" are allowed only for public and semi-public uses.... The content of a sign identifying an office or retail business determines in whole or in part the maximum sign face area allowable, the location of a sign, and the number of signs permitted. If a sign is used to identify a retail business or service, its sign face area "shall be related to the width (frontage) of the building"... Other signs with different content are not required to be related to building frontage.... When a sign's content identifies a service entrance, the sign must be attached to the building and may not exceed two square feet.... Temporary signs announcing sales, new products, or special business events, must be placed on the inside surface of windows and doors and must not exceed 50% of the window area despite the size of the window.... Automobile service stations are permitted to place information signs at fuel pumps and other service islands. Service station owners are limited to displaying "information regarding the type of service provided and other information essential in directing and instructing the motoring public."

*Id.* at 771–73 (citations omitted). These are just a few of the regulations in North Olmsted's sign ordinance which are substantially identical to regulations in Broadview Heights' sign ordinance or are similar in their structure.

After surveying the content-based restrictions on commercial speech in North Olmsted's sign ordinance, the court concluded:

The City has not provided any evidence to show why their content-based restrictions directly and materially contribute to their goals of safety and aesthetics. In fact, many of the City's content-based restrictions completely fail to contribute to safety and aesthetics and seem to be unrelated to these goals. The City's sign ordinance as a whole lacks rationality. In addition, the City has not demonstrated narrow tailoring of the regulation to its asserted interests nor has it demonstrated that it carefully calculated the costs and benefits associated with the burden on speech imposed by its regulation. The City's content-based regulations on commercial speech are unconstitutional.

*Id.* at 773 (footnote omitted).

North Olmsted's sign ordinance also contained a ban on pole signs and exemptions to that ban which resembled provisions in Broadview Heights' ordinance:

The City purports to expressly prohibit pole signs "in all zoning districts of the City", but in fact does not.

The ordinance exempts a number of signs from the pole sign prohibition. All official public notices, and the flag, emblem, or insignia of all governmental bodies are exempted from the ordinance. Temporary displays or signs in connection with a charity drive or to advocate the election of a candidate or the passage or disapproval of an issue are exempted for explicit time periods.

*Id.* at 773–74 (citations omitted). After describing these provisions, the court declared:

a content-based exemption from a ban is no less a content-based distinction because it is phrased as exempting certain speech from a ban rather than as imposing the restriction only on the burdened class of speech. Content-based restrictions of fully protected speech receive strict scrutiny.

The City argues that the pole sign ban is content neutral because the governmental exemptions are based on the physical ownership of the sign rather than on the content of its message. It also argues that the Court should read the ordinance as only exempting government-owned signs. These arguments do not save the City's content-based pole sign ban. The City's rationales for the ban are safety and aesthetics. It cannot be said that the government's pole signs—whether they are for the city recreational complex or city hall—are somehow less distracting or more pleasing to the eye than the pole sign of a private individual or business.

*Id.* at 774. The court found the ban on pole signs in conjunction with the described exemptions to be unconstitutional.

The *North Olmsted* court also struck down the permit scheme in North Olmsted's sign ordinance. The permit scheme was similar to the scheme in Broadview Heights' sign ordinance:

The City's permit system is not content neutral. The sign ordinance requires the building official to consider the design, color, orientation, visual impact and influence, as well as the "regulations of this Zoning Code governing the use, location, size and character of signs" in deciding whether or not to issue a permit.... [T]he sign ordinance governing the use, location, size, and character of signs is riddled with impermissible content-based distinctions. In deciding whether to issue a permit for any sign over six square feet in area, the building official must consider these content-based distinctions ... Thus, the permit scheme is an illegal system of prior restraint.

In addition to not being content neutral, the City's permit scheme ... lacks the constitutionally-required procedural

safeguards.... To avoid constitutional infirmity, a permit scheme must contain three procedural safeguards. First, the decision whether to issue a permit must be made within a "specified brief period," and if judicial review is sought, the status quo must be preserved pending "a final determination on the merits." Second, the scheme "must also assure a prompt final judicial decision, to minimize the deterrent effect of an interim and possibly erroneous denial of a license." Third, a censorship scheme must place the burden of instituting judicial proceedings and proving that the expression is unprotected on the censor.... [T]he City's ordinance does not adequately provide for any of the three procedural safeguards.

*Id.* at 776–78 (citations and footnote omitted). Consequently, the court concluded:

a system of prior restraint that fails to provide these procedural safeguards does not comport with the Constitution. The City's permit scheme violates the First Amendment because it fails to provide the procedural safeguards that are necessary for a lawful system of prior restraint.

*Id.* at 778. In the end, the court struck down North Olmsted's ordinance in its entirety because "the entire ordinance is ... so riddled with content-based distinctions that the offending portions cannot be severed without disrupting the entire ordinance." *Id.* at 779 (internal citation omitted).

The *North Olmsted* court explicitly rejected many of the arguments that defendants have made in this case. These include the arguments that (1) a regulation of speech is content-based only if the government entity intended to regulate content or justified the regulation on the basis of content; (2) a time, place, and manner test is appropriate as long as the regulating entity did not justify the regulation on the basis of content; and (3) *Renton* permits the conclusion that a regulation of any speech is not content-based if the state entity is concerned with regulating the secondary effects of that speech.

In sum, any reasonable official in the position of members of Broadview Heights' city counsel and the mayor should have understood that *North Olmsted* clearly established that an ordinance of the sort in effect in Broadview Heights violated XXL's rights under the First Amendment. For this reason, the magistrate judge recommends that the court find that the defense of qualified immunity is not available to the mayor and members of the city council of Broadview Heights.

## XI. Conclusion

The undersigned recommends that the district judge:

1. Grant XXL's motion for summary judgment and overrule defendants' motion for summary judgment as to the following claims:

 a. the ordinance unconstitutionally restricts non-commercial speech and impermissibly discriminates as to non-commercial speech according to its content;

 b. the ordinance impermissibly discriminates as to commercial speech according to content;

 c. the ordinance is an impermissible prior restraint of speech;

 d. the selective prohibition on pole signs in the sign ordinance makes impermissible content-based distinctions; and

 e. Broadview Heights violated XXL's right to procedural due process in removing its pole sign;

2. Grant defendants' motion for summary judgment as to XXL's claim that Broadview Heights' application of the

sign ordinance violates the equal protection clause;

3. Grant XXL's motion for summary judgment in part and overrule it in part and grant defendants' motion in part and overrule it in part as to:

 a. XXL's claim that certain terms in the ordinance are void for vagueness (as described on pp. 61–69);

 b. XXL's claim that the sign ordinance facially violates the equal protection clause (as described on pp. 70–73, 74–75);

4. Decline to rule on plaintiffs' and defendant's motions for summary judgment as to whether Broadview Heights' sign ordinance violates Ohio's ban on retroactive zoning changes as involving issues of state law made moot by the court's decisions regarding XXL's federal claims;

5. Overrule plaintiffs' and defendant's motions for summary judgment as to all other claims; and

6. Overturn Broadview Heights' sign ordinance *en toto* because of its violations of the First Amendment; or

7. In the alternative, if the court decides not to overturn Broadview Heights' sign ordinance *en toto*, the court order the alteration of Broadview Heights' sign ordinance as described on pp. 66–69, 74–75; and

8. Find that the defense of qualified immunity does not protect the named individual defendants from liability.

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within ten (10) days of receipt of this notice. Failure to file objections within the specified time waives the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir.1981). *See also Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985), *reh'g denied*, 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986).